UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TPG REWARDS, INC.,

                Plaintiff,

      v.

QUANTUM LOYALTY SYSTEMS, INC.,
QUANTUM CORPORATION OF NEW
YORK, INC., and RON RANDOLPH-WALL,

                Defendants.

Civil Action No.

**09–cv–00562 (DLC)**

<u>JURY TRIAL DEMANDED</u>

---

## COMPLAINT

Plaintiff TPG Rewards Inc. for its Complaint against Defendants Quantum Loyalty Systems, Inc., Quantum Corporation of New York, Inc. and Ron Randolph-Wall, hereby alleges as follows:

### THE PARTIES

1.     Plaintiff TPG Rewards, Inc. ("TPG") is a Delaware corporation having a place of business at 111 John Street, 27th Floor, New York, New York 10038 ("TPG").

2.     On information and belief, defendant Quantum Loyalty Systems, Inc. ("QLS") is a Nevada corporation having a place of business at 926 Incline Way, Suite 200, Incline Village, Nevada 89451. On information and belief, QLS does business throughout the United States, and within this Judicial District.

3.     On information and belief, defendant Quantum Corporation of New York, Inc. ("QNY") is a wholly-owned subsidiary of QLS, and is a Nevada corporation having a place of business at 926 Incline Way, Suite 200, Incline Village, Nevada 89451. On information and belief,

QNY does business throughout the United States, and within this Judicial District.

4.      On information and belief, defendant Ron Randolph-Wall is the President and CEO of QLS and QNY, has a business address at 926 Incline Way, Suite 200, Incline Village, Nevada 89451, and does business within this judicial district.

5.      On information and belief, each of defendants QLS, QNY and Randolph-Wall was, relative to the acts herein alleged, the agent of the other, and each was acting within the scope, purpose, and authority of that agency and with the knowledge, permission and consent of the other.

6.      On information and belief, defendant Randolph-Wall has controlled the acts of QLS and QNY as alleged herein.

7.      On information and belief, there has existed such a unity of interest between QLS and QNY and defendant Randolph-Wall that any individuality and separateness of QLS and QNY and defendant Randolph-Wall has ceased, and that each is the agent and alter-ego of the other in the acts hereinafter alleged.

8.      On information and belief, any and all acts hereinafter ascribed to QLS and QNY or defendant Randolph-Wall were done with the permission, consent, knowledge, and active inducement on the part of the other defendants which together acted as co-conspirators and/or agents in the performance of the acts hereinafter more particularly described.

## NATURE OF CLAIMS AND BASIS FOR JURISDICTION AND VENUE

9.      This is an action for a declaratory judgment that U.S. Patent Nos. 7,066,383; 7,156,294; and 7,337,949, are invalid, unenforceable and not infringed by Plaintiff.

10.     This action arises under the Patent Law, Title 35 of the United States Code.

11.     This court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a) and (b), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this jurisdiction under 28 U.S.C. §§ 1391(b) and (c).

13.     Defendants have asserted that Plaintiff makes, uses, sells or offers for sale a product and/or service that infringes U.S. Patent No. 7,337,949 ("the '949 Patent"). The '949 Patent is a continuation of U.S. Patent No. 7,156,294 ("the '294 Patent"), which is a continuation of U.S. Patent No. 7,066,383 ("the '383 Patent"). Thus, the '949 Patent, '294 Patent and '383 Patent all belong to the same patent family, and have the same written description and similar claims. As a result of Defendants' assertions, an actual cause and controversy now exists between the parties with respect to the validity, enforceability and infringement of the '949 Patent, '294 Patent and '383 Patent.

## FACTS COMMON TO ALL CLAIMS

14.     TPG has been in the business of creating a variety of incentive awards programs for its customers since at least 2006. One such program is the MOVIE CASH® program, which was created at least as early as 1994 by TPG's predecessor and has been marketed and sold by TPG and its predecessors continuously since 1994. Defendant Randolph-Wall was employed by TPG's predecessor, in New York, New York, at or around that time.

15.     The MOVIE CASH® program rewards purchasers of certain products with free or discounted movie tickets redeemable at movie theatres throughout the United States. The MOVIE CASH® program is intended to boost product sales by attracting consumers with the offer of a free or discounted movie ticket in connection with the purchase of a particular product.

3

16.     In or about December 1998, TPG's predecessor entered into a Distributorship Agreement with the predecessor to Utix, according to which Utix distributed, *inter alia*, TPG's MOVIE CASH® programs.

17.     On information and belief, on or about April 20, 2004, Anthony G. Roth ("Roth"), the former President of Utix, filed an application for a U.S. Patent, Serial No. 10/827,737, and signed a declaration under oath falsely claiming to be the sole inventor of the subject matter disclosed and claimed in the patent application. This patent application later issued as the '383 Patent, which Roth assigned to Utix. (Exhibit A.)

18.     On information and belief, on or about August 15, 2005, Roth, the former President of Utix, filed a continuation application for a U.S. Patent, Serial No. 11/204,803, relying on the same false declaration. This patent application later issued as the '294 Patent, which Roth assigned to Utix. (Exhibit B.)

19.     On information and belief, on or about December 19, 2006, Roth, the former President of Utix, filed a continuation application for a U.S. Patent, Serial No. 11/641,304, relying on the same false declaration. This patent application later issued as the '949 Patent, which Roth assigned to Utix. (Exhibit C.)

20.     Defendants have asserted that the MOVIE CASH® program, which has been used by TPG and its predecessors since 1994, infringes the '949 patent, which, on information and belief, is based on an application for it filed on or about April 20, 2004.

21.     During prosecution of the applications for the '949 Patent, '294 Patent and '383 Patent, neither Roth nor Utix nor their attorneys disclosed the pre-existing TPG MOVIE CASH® program to the United States Patent and Trademark Office ("PTO"), and withheld such material

prior art, on information and belief, with an intent to deceive the PTO.

22.     QLS is a direct competitor of TPG in the market for incentive awards program services. On information and belief, in or around March 2008, QNY purchased the '949 Patent, the '294 Patent and the '383 Patent from Utix, which was selling its assets.

## COUNT I
## DECLARATION OF INVALIDITY AND NONINFRINGEMENT
## OF U.S. PATENT NO. 7,337,949

23.     TPG repeats the allegations set forth in paragraphs 1 through 22 as if fully set forth herein.

24.     On information and belief, on or about March 4, 2008, the '949 Patent, entitled "System for Marketing Leisure Activity Services Through Prepaid Tickets," issued to Utix Group, Inc. ("Utix") of Burlington, Massachusetts. The '949 Patent identifies Roth as the sole inventor on its face.

25.     On information and belief, the '949 Patent presently is owned by QNY, which has exclusively licensed the '949 Patent to QLS.

26.     The '949 Patent, and each and every claim thereof, is invalid and void for failure to meet the requirements of Title 35, United States Code, including the requirements of sections 101, 102, 103, and/or 112.

27.     On information and belief, Roth, Utix and/or their attorneys engaged in inequitable conduct in the PTO by at least the following acts: (i) On or about April 15, 2004, Roth signed a declaration ("the Roth Declaration") claiming to be the original, first and sole inventor of the subject matter claimed in the application for the '949 Patent; to the extent that the claims of the '949 Patent

cover TPG's MOVIE CASH® program, such declaration is false; (ii) On or about December 19, 2006, Roth's attorneys, Hamilton, Brooks, Smith & Reynolds, P.C. ("the Hamilton Brooks firm") filed the false Roth Declaration with the PTO in the application for the '949 Patent with the PTO; and (iii) Roth, Utix and the Hamilton Brooks firm failed to disclose TPG's MOVIE CASH® program to the PTO during prosecution of the '949 Patent in an Information Disclosure Statement filed on July 20, 2007, or at any other time, in violation of their duty of disclosure set forth in 37 C.F.R. § 1.56. As a result of such inequitable conduct, the '949 Patent, and each and every claim thereof, is invalid.

28.     TPG has not infringed, and is not now infringing the '949 Patent.

29.     As a result of Defendants' acts, TPG has been damaged, and will continue to be damaged by Defendants' assertion of infringement of the patents-in-suit, and TPG will be irreparably harmed thereby.

30.     TPG has no adequate remedy at law.

## COUNT II
## DECLARATION OF INVALIDITY AND NONINFRINGEMENT
## OF U.S. PATENT NO. 7,156,294

31.     TPG repeats the allegations set forth in paragraphs 1 through 30 as if fully set forth herein.

32.     On information and belief, on or about January 2, 2007, the '294 Patent, entitled "System for Marketing Leisure Activity Services Through Prepaid Tickets," issued to Utix. The '294 Patent identifies Roth as the sole inventor on its face.

33.     On information and belief, the '949 Patent presently is owned by QNY, which has

6

exclusively licensed the '294 Patent to QLS.

34.     The '294 patent, and each and every claim thereof, is invalid and void for failure to meet the requirements of Title 35, United States Code, including the requirements of sections 101, 102, 103, and/or 112.

35.     On information and belief, Roth, Utix and/or their attorneys engaged in inequitable conduct in the PTO by at least the following acts: (i) On or about April 15, 2004, Roth signed a declaration ("the Roth Declaration") claiming to be the original, first and sole inventor of the subject matter claimed in the application for the '294 Patent; to the extent that the claims of the '294 Patent cover TPG's MOVIE CASH® program, such declaration is false; (ii) On or about August 15, 2005, Roth's attorneys, Hamilton, Brooks, Smith & Reynolds, P.C. ("the Hamilton Brooks firm") filed the false Roth Declaration with the PTO in the application for the '294 Patent with the PTO; and (iii) Roth, Utix and the Hamilton Brooks firm failed to disclose TPG's MOVIE CASH® program to the PTO during prosecution of the '294 Patent in an Information Disclosure Statement filed on August 15, 2005, or at any other time, in violation of their duty of disclosure set forth in 37 C.F.R. § 1.56. As a result of such inequitable conduct, the '294 Patent, and each and every claim thereof, is invalid.

36.     TPG has not infringed, and is not now infringing the '294 Patent.

37.     As a result of Defendants' acts, TPG has been damaged, and will continue to be damaged by Defendants' assertion of infringement of the patents-in-suit, and TPG will be irreparably harmed thereby.

38.     TPG has no adequate remedy at law.

**COUNT III**
**DECLARATION OF INVALIDITY AND NONINFRINGEMENT**
**OF U.S. PATENT NO. 7,066,383**

39.     TPG repeats the allegations set forth in paragraphs 1 through 38 as if fully set forth herein.

40.     On information and belief, on or about June 27, 2006, the '383 Patent, entitled "System for Marketing Leisure Activity Services Through Prepaid Tickets," issued to Utix.  The '383 Patent identifies Roth as the sole inventor on its face.

41.     On information and belief, the '383 Patent presently is owned by QNY, which has exclusively licensed the '383 Patent to QLS.

42.     The '383 patent, and each and every claim thereof, is invalid and void for failure to meet the requirements of Title 35, United States Code, including the requirements of sections 101, 102, 103, and/or 112.

43.     On information and belief, Roth, Utix and/or their attorneys engaged in inequitable conduct in the PTO by at least the following acts: (i) On or about April 15, 2004, Roth signed a declaration ("the Roth Declaration") claiming to be the original, first and sole inventor of the subject matter claimed in the application for the '383 Patent; to the extent that the claims of the '383 Patent cover TPG's MOVIE CASH® program, such declaration is false; (ii) On or about April 20, 2004, Roth's attorneys at the time, Duane Morris LLP, filed the false Roth Declaration with the PTO in the application for the '383 Patent with the PTO; and (iii) Roth, Utix, Duane Morris LLP and the Hamilton Brooks firm (which was later substituted as attorney of record) failed to disclose TPG's MOVIE CASH® program to the PTO during prosecution of the '383 Patent in an Information Disclosure Statement filed on April 20, 2004, or at any other time, in violation of their duty of

disclosure set forth in 37 C.F.R. § 1.56. As a result of such inequitable conduct, the '383 Patent, and each and every claim thereof, is invalid.

44.  TPG has not infringed, and is not now infringing the '383 Patent.

45.  As a result of Defendants' acts, TPG has been damaged, and will continue to be damaged by Defendants' assertion of infringement of the patents-in-suit, and TPG will be irreparably harmed thereby.

46.  TPG has no adequate remedy at law.

## COUNT IV
## NEW YORK COMMON LAW UNFAIR COMPETITION

47.  TPG repeats the allegations set forth in paragraphs 1 through 46 above as if fully set forth herein.

48.  This cause of action is for unfair competition and arises under the common law of the State of New York.

49.  On information and belief, Defendants have created a likelihood of injury to TPG's business reputation by asserting patents in bad faith which they know or should have known to be invalid and/or non-infringed by TPG.

50.  On information and belief, Defendants' conduct is specifically designed to capitalize on the initiative and goodwill of TPG and has been undertaken in bad faith.

51.  TPG has been, is being and will continue to be irreparably damaged by such acts and damage will continue unless the acts are enjoined by this Court. TPG has no adequate remedy at law.

**WHEREFORE**, plaintiff TPG Rewards, Inc. demands judgment:

9

(a)     Declaring that United States Patent No. 7,066,383, and each and every claim thereof, is invalid, unenforceable and not infringed by TPG;

(b)     Declaring that United States Patent No. 7,156,294, and each and every claim thereof, is invalid, unenforceable and not infringed by TPG;

(c)     Declaring that United States Patent No. 7,337,949, and each and every claim thereof, is invalid, unenforceable and not infringed by TPG;

(d)     That Defendants, their agents, servants, attorneys, and employees, and all those in active concert or participation with Defendants be permanently enjoined from threatening TPG or its customers based upon the alleged infringement of the '949 Patent, '294 Patent and/or '383 Patent, or from charging or asserting that TPG or its customers are infringing the '949 Patent, '294 Patent and/or '383 Patent;

(e)     That TPG be awarded damages under New York Law;

(f)     That the damages awarded to TPG be trebled due to the willful and malicious acts of Defendants;

(g)     That TPG be awarded the costs of this action, including its reasonable attorneys' fees due to the exceptional nature of this case, pursuant to 35 U.S.C. § 285 and New York Law; and

(h)      That TPG have such other relief as the Court may deem just and proper.

TPG REWARDS, INC.

Dated: January 20, 2009                    By: _Robert T. Maldonado_

Robert T. Maldonado (RM 7873)
Norman H. Zivin (NZ 6053)
Tonia A. Sayour (TS 7208)
COOPER & DUNHAM LLP
1185 Avenue of the Americas
New York, New York, 10036
Tel.  (212) 278-0400
Fax. (212) 391-0525
E-mail: RMaldonado@cooperdunham.com

Attorneys for TPG Rewards, Inc.

# Exhibit A

US007066383B2

(12) **United States Patent**
Roth

(10) Patent No.: **US 7,066,383 B2**
(45) Date of Patent: **Jun. 27, 2006**

(54) **SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS**

(75) Inventor: **Anthony G. Roth**, Newburyport, MA (US)

(73) Assignee: **Utix Group, Incorporated**, Burlington, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 73 days.

(21) Appl. No.: **10/827,737**

(22) Filed: **Apr. 20, 2004**

(65) **Prior Publication Data**

US 2005/0230468 A1    Oct. 20, 2005

(51) **Int. Cl.**
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** ...................... 235/375; 235/379; 235/381; 235/383; 705/14; 705/39; 705/69

(58) **Field of Classification Search** ................ 235/375, 235/379, 380, 381, 383; 705/65, 39, 14, 705/69
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,949,256 | A * | 8/1990 | Humble | 705/14 |
| 5,903,633 | A * | 5/1999 | Lorsch | 379/114.2 |
| 6,192,113 | B1 * | 2/2001 | Lorsch | 379/114.2 |
| 6,422,462 | B1 | 7/2002 | Cohen | |
| 6,594,640 | B1 | 7/2003 | Postrel | |

| | | | | |
|---|---|---|---|---|
| 2003/0050041 | A1 * | 3/2003 | Wu | 455/406 |
| 2003/0053609 | A1 * | 3/2003 | Risafi et al. | 379/114.2 |
| 2003/0194988 | A1 * | 10/2003 | Knox | 455/406 |
| 2004/0011864 | A1 * | 1/2004 | Thompson et al. | 235/380 |
| 2004/0039633 | A1 * | 2/2004 | Nicholson | 705/14 |
| 2004/0068437 | A1 * | 4/2004 | McGee et al. | 705/14 |
| 2004/0133511 | A1 * | 7/2004 | Smith et al. | 705/39 |
| 2004/0158493 | A1 * | 8/2004 | Nicholson | 705/14 |
| 2005/0033639 | A1 * | 2/2005 | Myers | 705/14 |

* cited by examiner

*Primary Examiner*—Jared J. Fureman
*Assistant Examiner*—Allyson N. Trail
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57) **ABSTRACT**

One-time-use tickets containing a unique identification code that allow for prepayment of entertainment or personal services are distributed and sold. When a ticket is sold, it is activated by the seller notifying a ticket information manager of its sale, at which time the ticket's unique identification code is recorded by the ticket information manager. Part of the sale price is transferred by the vendor to an account maintained by a ticketing program manager. Ticketholders present the ticket for redemption of the particular service from an agreed service provider. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated. While the purchase price of the ticket is fixed, service providers will receive their agreed payment price from the ticketing program manager's account when a ticket user redeems a ticket regardless of whether that price is higher or lower than the ticket purchase price.

**19 Claims, 2 Drawing Sheets**



**U.S. Patent**    Jun. 27, 2006    Sheet 1 of 2    US 7,066,383 B2

**FIGURE 1**

Prepaid Services System  10





**FIGURE 2**

Prepaid Services Method

Step 100
Establish agreed service provider network

Step 110
Establish seller network

Step 120
Distribute tickets to sellers

Step 130
Sell tickets to purchasers

Step 131
Seller contacts ticket information manager

Step 132
Ticket information manager confirms ticket valid & stores information

Step 133
Ticket information manager notifies Seller ticket is valid

Step 134
Seller sends funds to ticketing program manager

Step 140
User can add incremental value to ticket if desired

Step 150
User redeems ticket at service provider

Step 151
Service provider contacts ticket info. manager

Step 152
Ticket info. manager checks vendor inclusion table

Step 153
Ticket information manager checks if ticket is valid

Step 154
If ticket is valid, ticket information manager updates data and notifies service provider

Step 155
Ticketing program manager sends funds to service provider

Step 160
Ticketing program manager reconciles income & adjusts ticket prices accordingly

US 7,066,383 B2

**1**

# SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS

## FIELD OF THE INVENTION

The invention relates to marketing and distributing services, especially participatory sports or entertainment services, by collecting a prepayment and issuing to a customer a ticket or similar indicia that can be redeemed for a particular service. The service is one that can be obtained at the customer's option from any of a plurality of distinct service providers, including providers that normally charge more or less than others for the particular service involved. The invention further involves accounting for the usage and payment for services on this basis.

## BACKGROUND OF THE INVENTION

Goods and services are typically obtained in exchange for payment and the payment might be rendered in various ways and in various amounts, such as by tender of cash currency, funds transfer between accounts, debit card purchase and exhaustion, credit arrangements involving future payment, barter or various other techniques. The particular goods or services that a customer might obtain from different providers differ. The reputations of providers differ. The manner of providing services, such as the time of day or as a function of demand or other aspects also differ. Importantly, the providers also demand different prices.

The differences between available offerings of goods and services generally boil down to differences in the costs and benefits of available goods and services that consumers have the option to choose. The costs and benefits of the possible choices are judged and compared by customers when making purchasing decisions. The customers seek the greatest benefit per unit cost and are free to make selections among a variety of different providers' offerings and terms, or even to substitute one type of service for another according to the customer's needs.

The relative merits and different options are perceived differently by different consumers, such that some consumers are willing to pay more or less than others for particular aspects of goods or services. The confluence of offerings (including what is offered and the terms of payment) with the selections made by consumers is the nature of the market of supply and demand by which resources are allocated among consumers in a market economy.

Not all consumer transactions are classic exercises of supply and demand wherein the customer has the utmost control and choice among differing alternatives with incrementally different costs and/or different pricing and payment arrangements. One example is a vendor's prepaid gift indicia, which can take various forms ranging from an authorized numbered slip bearing the vendor's name and a dollar amount to plastic cards bearing the vendor's logo and having a magnetically readable strip with a predetermined dollar value, each redeemable at the vendor's sales outlets. A prepaid gift indicia is generally issued by a particular retailer and can only be redeemed at that retailer's facilities. In this situation, the person who purchases the gift indicia may exercise a degree of choice, but the person who redeems it (typically the recipient of the gift) has no choice except to use the issuing retailer as the provider. Inasmuch as the issuer and the provider are the same entity, the issuer/provider has full control of the extent to which the selling price of the gift card corresponds to the offering price of the

**2**

goods or services that are delivered. It is conceivable that the issuer/provider may include a premium or discount to encourage patronage and/or purchase of gift indicia, but within the control of the issuer/provider, the goods or services are provided in exchange for an amount that is related to the issuer/provider's pricing schedules.

It its known that providers of personal entertainment and sporting services, can issue a gift ticket that represents an incremental cash value or an incremental quantity of their services. This is possible because pricing and terms upon the sale of the gift ticket are controlled by the same party that controls the nature, quality and delivery terms of the services. As a result, the issuer/provider can issue a gift ticket for a given cash value or for a given increment of services. Thus a gift ticket or coupon might be granted for one pass to a matinee show or one Saturday afternoon bowling game, presumably with the ticket priced at an amount related to the pricing of the associated service. If the gift ticket is not defined as equal to a given service and/or if the issuer offers different services at different prices, then the gift ticket is denominated as a cash value and the user is entitled to deduct from the value on the ticket when paying for services, until the value associated with the ticket is exhausted.

It would be advantageous if a convenient arrangement could be organized whereby different potentially-competing suppliers of services can all honor a coupon or gift ticket or similar indicia of value that is denominated not in a monetary value but as a particular service. It is not possible for the purchaser of a gift ticket for a given increment of services from one establishment to redeem the gift ticket at another establishment for comparable services, because the services are not likely to be of the same value to consumers, or offered at the same price by suppliers. If such a system were envisioned, it would necessarily involve exchanges of cash value and not transactions for a given increment of services regardless or where it is obtained.

A gift ticket system might be envisioned where one can buy a gift ticket for an incremental entertainment service (a single movie showing, for example), but if that gift ticket was to be redeemable at any of a plurality of competing different movie theaters, some provision would be needed to account for the fact that some theaters are more comfortable, have larger screens and better sound systems and consequently have higher ticket prices than others. Such an arrangement would not likely be practical, or at least would be less practical than using cash currency, and would require a network of behind-the-scenes fund transfers in varying amounts per transaction, between establishments at which the gift tickets are sold to customers and establishments at which the customer redeems the tickets for more or less expensive entertainment services. On the other hand, one could issue gift tickets for an incremental amount of money, leaving it to the consumer to decide where to expend the gift ticket, either wholly or in some successive number of transactions that each represent less than the full initial cost of the gift ticket.

Gift tickets can resemble debit cards and be presented by customers for deduction of an incremental monetary value in exchange for goods or services of that cost. It is known to have the representation of value carried on the card itself (e.g., in the case of a "smartcard" having security aspects). Alternatively, it is known to have the card carry a serial number or address associated with a record stored in a database in communication with points of sale. These arrangements also require behind-the-scenes transfer of

US 7,066,383 B2

3

funds among the entities selling the cards, perhaps the customer, and the entities at which the card is redeemed for goods or services.

It is known that credit cards can be issued that may be selectively limited to certain vendors, either by the users (to limit purchases by their children or others to whom the cards are lent) or by corporations (for example to employees' limit meal and entertainment expenses to certain establishments). See Cohen, U.S. Pat. No. 6,422,462 "Apparatus and Methods for Improved Credit Cards and Credit Card Transactions." Such cards are still redeemable, however, for the cash value of purchases made and the users are still responsible for paying for transactions on an as-used basis.

An arrangement that requires such a network of funds transfers is actually already in place. Credit card systems including Visa, MasterCard, Discover, American Express, etc., deal with goods/services providers across the board. They are available for the most part to any customer and to any supplier. However, existing credit card systems work because there is a medium of exchange, namely dollars and cents (or other currencies), that is the same as to all suppliers and all possible goods and services. There is no practical way in which to supply a given service, such as a round of golf or a theater ticket, that is free of association with a particular supplier and might be redeemed by the customer at any of a plurality of possible suppliers, even though their pricing may differ, without relying on a backup funds transfer network associated with the point of sale.

SUMMARY OF THE INVENTION

An inventive system and method arrange for prepayment by a customer of a predetermined sum for indicia such as a one-time-use gift ticket. The ticket is redeemable for a particular incremental quantity of services, as opposed to a cash value. The ticket is redeemable at any of a plurality of different providers that offer services that might be more or less similar but that qualify as the stated sort of services. The system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., a movie pass (at any participating theater), a round of golf (at any participating golf course), a spa treatment (at any participating spa), etc.

The providers are independent entities that determine the nature of their own offerings and set their own prices. The gift ticket issuer enlists a number of suppliers of services to be obtained by redemption of the ticket for services, each having offerings that have character, terms and pricing arrangements that are approximately equal but may differ up to some threshold. Enlisted service providers agree to participate in the program and agree to accept the prepaid gift ticket as a payment method.

According to an inventive aspect, the enlisted service providers are not required to accept some standard or negotiated amount that is less than their regular price for services of the type that are delivered. Instead, the service providers accept for payment one time use tickets and process the sale to the customer over an existing credit card network or as some other financial transaction (including such instant payment systems as Pay Pal, which allows secured payment directly out of an existing bank account) in which the account that is debited is the account of the entity that issued the one-time-use ticket.

Gift tickets are sold through sales outlets, through the Internet, by telephone or in large blocks to institutional purchasers. Participating merchants whose services may be redeemed through the gift ticket system can also be empow-

4

ered to sell the tickets. The tickets can be retail items of purchase that are activated at the point where the tickets are sold to customers.

The customers can use the gift tickets to redeem a stated increment of services for themselves or can present the ticket as a gift. The system is particularly applicable for use in giving gifts or employee awards or incentives, because the emphasis is wholly on redemption for the services and not on redemption of a given cash value.

Gift tickets each contain a unique identification code and are loaded with a predetermined value identified as a one-time use at any customer-chosen one of the service providers who have agreed to participate and who provide the pertinent goods or services that are identified when the ticket is sold.

When a ticket is sold, it is activated by the seller, for example by scanning a bar code associated with a uniform product code or by swiping a magnetic strip on the ticket itself, and notifying a ticket information manager of its sale. At that time, the unique identification code of the ticket is noted in a memory file by the ticket information manager. A predetermined portion of the sale price (i.e. less any service fee to the vendor) can be transferred by the vendor to the ticketing program manager at the time of ticket activation. Another alternative is that the entire purchase price is credited to an account maintained by or for the ticketing program manager who then regularly compensates the vendor for its participation, either on a flat-fee basis or as some function of the number of tickets sold, including perhaps added incentives at various sales level thresholds.

Gift tickets sold over the Internet or by telephone can be mailed in an activated state or can employ security features requiring the purchaser to activate the ticket (by Internet or telephone) upon receipt, for example, by repeating a code that was given to the purchaser at the time of the sale or by repeating a password determined by the purchaser at the time of sale.

The ticket can be purchased by the ultimate user or advantageously be given by the purchaser to the end user, for example as a gift, an employee or sales incentive award, a premium item or the like. The gift ticket holder presents the ticket for redemption of the particular service from one of a plurality of agreed service providers. The identities of the agreed service providers can be stored in an inclusion table that is employed by a ticket information manager. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated, in a transaction that is much the same as a credit card authorization, which can use the same point of sale network communications as a credit card transaction.

According to another aspect, although the gift ticket is issued as a one-time-use item, purchasers can choose to add incremental value to upgrade the ticket at the time of purchase or prior to redemption. This feature has two main applications. With the capability of adding an incremental value, it is possible to apply the invention to services of a given kind (such as a round of golf, for example) that have more than some predetermined threshold difference in value that prevents them from being peers. Thus, the invention can be applied to an arrangement in which 18 holes at an international golf course such as Pebble Beach or the Masters' course in Augusta, for example, can be regarded as distinct services from less prestigious local golf courses that represent the norm. The customer can purchase an upgrade (or several incremental upgrades if more than one is needed for a particular provider) if desired, to the higher quality

US 7,066,383 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

level in the same category of "a round of golf," which can be redeemed at any of the venues that fall into the higher classification.

Alternatively or in addition to providing upgrades for moving upwardly between two or more classes of a given service that might render two alternatives as peers, the holder of a ticket can be permitted to obtain an upgrade that arranges a ticket issued for one person for a given class of services to be redeemable for more than one person, within the same class of services.

Upgrades as described can be purchased in a manner similar to the initial transaction at which the ticket was originally offered and sold. Alternatively, sales of upgrades can be made in various other ways, such as through an Internet web site with the use of a credit card or by touch tone telephone through an Interactive Voice Response system connected to the ticket information manager's data storage system.

It is an aspect of the system and method that the purchase price of the gift ticket is fixed, but the ticket holder can redeem the ticket at any of a plurality of providers of a given service, even though the service providers may normally assess different prices. The service providers are credited in the redemption process with their agreed payment price from the ticketing program manager, so that the provider is paid in a normal manner when a ticket user redeems a ticket for a service. In this way, ticket holders are fully as welcome at the provider's establishment as a customer that might remit cash currency when obtaining the same service. In one embodiment of the system, the ticket is recognized by an existing credit card system such as American Express, Visa, Master Charge, Discover, etc. (particularly, Discover, which currently has the capability to distinguish among vendors in an inclusion list), and can be swiped in existing point of sale terminals, thus allowing for familiar use by the service provider and instant payment to the service provider's account. The service provider is credited for the price of its services in the usual manner of a credit card network, but unlike the usual credit card transaction, a charge is not levied against the user's account, but is debited against an account held by the ticketing program manager.

A system is also disclosed to implement the marketing, sale, redemption and account management of a one-time-use gift ticket for prepaid entertainment or personal services.

The above aspects and features of the invention will be better understood from and are disclosed in further detail by the following detailed description of certain preferred embodiments of the invention, provided in connection with the accompanying drawings, forming a part of this written description.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate preferred embodiments of the invention as well as other information pertinent to the disclosure, in which:

FIG. 1 is a stylized block diagram overview of a prepaid services system according to the invention; and,

FIG. 2 is a flow diagram illustrating steps of an exemplary embodiment and method of administering a prepaid services system.

DETAILED DESCRIPTION

Referring to FIG. 1, a stylized overview of a prepaid services system, 10, is provided. As described herein, the prepaid services system includes seven primary parties:

seller 20, purchaser 30, ticket user 35, ticket information manager 70, service provider 80, financial network and ticketing program manager 95.

Referring to the flow diagram of FIG. 2, at step 100, a ticketing program manager 95 desiring to implement the one-time-use gift ticket system of the invention, especially for a particular type of entertainment or personal service but also potentially for sale of goods, enlists a plurality of providers 80 of one or more substantially comparable services. The ticketing program manager 95 negotiates if necessary with the providers to honor the one-time-use ticket 40 according to the procedures described herein, namely to accept the ticket in exchange for provision of the provider's regular services and to seek remuneration for such services from the system maintained by or for the ticketing program manager.

It is advantageous for the ticketing program manager who enlists the service provider to bring the provider on as a member of a common group enterprise including, for example, advertising the enterprise and the provider's membership in the enterprise and the like. Likewise, membership in the enterprise can benefit individual providers, through additional advertising, access to new clientele and association with a product (the one-time-use ticket) that may be promoted as having a certain desirable cachet in and of itself. Additionally, it is desirable that the service providers accept the ticket at all times they are open, so that a "no-blackouts" feature of the gift ticket will enhance its acceptance in the marketplace and add to the desirability of receiving such a pass as a gift. However, it is not strictly necessary for the provider to undertake any particular responsibilities other than to provide the same services to gift ticket users as the provider provides to regular cash customers.

In this exemplary illustration of the invention, plural service providers 80 all provide at least one same stated service or article of goods, for example a round of golf, a day's worth of skiing or treatment at a health spa or the like. A broad network of providers of like services who accept the one-time-use ticket improves the marketability of the ticket, since the ability for the user to select among a variety of convenient providers is a desirable feature and one which differentiates the ticket in the present invention from ordinary gift cards or other indicia redeemable only at the retailers from whom it was purchased. It is also expected that the various providers will provide somewhat different services and may assess different charges, up to a threshold of difference within which the providers are considered to provide the "same" service as authorized and redeemable by presenting the one time use gift ticket.

Therefore, while the particular service for which a ticket is to be used is nominally the same service for that series of ticket (i.e., for tickets sold for redemption for a uniquely named or described service), the service providers need not all agree to provide identical services or to charge a dictated price for their services. Within the threshold of comparable pricing, differences in services can be accommodated owing to such factors as specific service component differences, location, prestige and quality, or other differences, as well as arbitrary consumer preferences. It is an inventive aspect of the subject system and method that service providers are not required to each accept identical payment value for their services, despite the fact that the gift ticket is sold for a given price and is redeemable for such services at any of the service providers.

The ticketing program manager sets the price charged by seller 20 for sale and activation of the ticket, so as to

7

accommodate variations in actual service provider prices. One way to do this is to set the ticket price in view of the most expensive of all of the service providers, plus any service fee collected by the ticketing program manager. Another method, that advantageously allows a lower ticket price, and which can be expected to improve sales, is to set the ticket selling price near to the average charge incurred by all users of the service providers, plus costs of operating the system and a reasonable return to the ticketing program manager. Costs of operating the system can include items such as a fee to the ticket information manager for maintaining a processor to handle ticket information data storage and verification and validation of tickets and costs associated with the financial network, which might be a credit card network, in which case the credit card company might receive a portion of the sale price.

That is, the ticket selling price should be set and/or periodically adjusted so that the use of the tickets integrated over all the users and providers, has a sufficient surplus selling price over the average cost of the service (which may or may not be the same as the average provider price, given that users may frequent certain providers more than others), to provide at least a modest return on investment to the ticketing program manager. The ticket selling price is determined so that any overage that accumulates when a ticket is used to obtain the service from providers whose services are priced at less than the ticket selling price is balanced against the shortfall that arises when a ticket is used to obtain the service from providers whose services are priced higher than the ticket selling price. This calculation advantageously takes into account the extent to which users may prefer to patronize certain providers over others (e.g., providers that are perhaps more prestigious, that advertise more, that have been in business longer or that have locations that are convenient to a larger number of users). The calculation also provides for a return to the ticketing program manager over a break-even number.

After the service provider relationships have been established (step 100) or while that is occurring, the ticketing program manager 95 establishes relationships with existing sales outlets (step 110) who will sell the one-time-use tickets. The sellers 20 have point of sale terminals 50 connected to an existing network 60 that will allow fast, efficient communication with the ticket information manager 70. This communication is desirable for the transfer of the information required to initialize a ticket once it has been purchased. If the existing network is connected to a financial network 90, such as that maintained by a credit card company, this can also facilitate the automatic transfer of funds between the sellers 20 and the ticketing program manager 95 and between the ticketing program manager and service providers 80. For example, the credit card company can maintain an escrow account for the ticketing program manager, into which funds are transferred from the sellers and from which funds are withdrawn to pay service providers. By using an existing credit card network as the financial "rail" for the system, funds transfers can be managed with minimal day-to-day involvement from the ticketing program manager. While the use of an existing credit card network as the communication network carries certain advantages it is also possible for the required communications to take place over an Internet connection (for example to a secure web page hosted by the account manager) or a telephone connection to either "live" operators or an Interactive Voice Response system connected to the ticket information manager's (70) data storage equipment.

8

In one exemplary embodiment, the ticket information manager 70 has a communications link or other access to a financial network 90 which is a credit card provider's network. When a ticket is swiped on a point of sale terminal 50 at either the seller's end or the service provider's end, the credit card network will communicate with or otherwise access the ticket information manager's equipment. All ticket verification or validation and approval of service providers is handled directly by the ticket information manager. The ticket information manager simply returns an accept or reject message to the credit card network, which then either causes the transaction to be processed at the point of sale terminal or not.

In an alternative embodiment, the gift ticket issuer can be a commercial organization other than a seller, with communications equipment or the like to activate the ticket through communications with the ticketing program manager.

Once relationships with the sellers 20 and service providers 80 are established, the ticketing program manager distributes one-time-use tickets (step 120). Preferably the tickets are distributed at first in an un-initialized state, namely functional but not yet validated for use. A validation process includes placing suitable codes or notations on the tickets or storing codes in the tickets or elsewhere in a data storage medium that is accessible over a communication network. These codes can be checked when determining whether to permit use of the tickets.

In one embodiment, the tickets have a preprinted unique identification code and a magnetic strip or other means of recording information. The strip or other means can be prerecorded with a unique or at least substantially unique identification code for each ticket. The unique identification code may be an alphabetic code, a numeric code, an alpha numeric code, or other appropriate identification code capable of uniquely identifying an individual ticket, and perhaps also identifying the related type of service (e.g., golf, spa, etc.). In an alternate embodiment, the tickets do not have a preprinted or prerecorded identification code, but do contain a recordable medium such as a magnetic strip or an electronic storage device, which may be loaded with a unique code preliminarily or may have an area in which such a code is inserted as a part of the initialization procedure.

According to an advantageous aspect, the issued ticket is configured and formatted with certain indicia characteristic of a standard credit card. This can include, without limitation, printed or embossed account identification numbers, a magnetic strip or on board integrated circuit memory, a one or two dimensional optical bar code, etc. The information can be prerecorded or at least partly recordable. Two or more redundant means for storing the same information, such as an account number or the like, can be provided for data entry in different optional ways, of the different storage techniques can be used for information that is otherwise cross referenced. Advantageously, the ticket has sufficient information carried thereon to permit use of the ticket substantially in the same physical manner as a standard credit card, namely using equipment conventionally provided at a point-of-sale terminal 50 (scanners, magnetic strip swipe readers, keyboards, etc.).

In one embodiment, the ticketing program manager has reserved for itself a series of digits or numbers or number combinations in a standard credit card format that are unique to the account manager and identify one or more accounts associated with the ticketing program manager. Initialization and validation steps, which are processed by a ticket information manager 70 can be undertaken over an existing communication network 60, which advantageously is a

US 7,066,383 B2

9

network that processes conventional credit cards, or can be another public or private data communication network. Other types of communication devices may be used instead of or in addition to a standard point-of-sale terminal programmed to handle credit cards, so long as the device is capable of communicating sufficient ticket information over an operable communications network to effect the steps as described herein. For example, in another form of the invention, the ticket information can be transmitted between the seller and the ticket information manager by telephone either by voice in association with a live operator or through a telephone keypad in an Interactive Voice Response system.

The one-time-use ticket proceeds through several steps associated with initial issue, sale (preferably with validation concurrently upon sale), and later presentation as an identification of value used to present remittance for a service. At step **130**, the purchaser **30** selects a gift ticket for purchase and pays the seller **20** some agreed purchase price **31**. This transaction can be a conventional retail, wholesale or other transaction in which one or more tickets are exchanged for cash or credit or other remuneration.

At step **131**, the seller **20** activates the ticket, preferably including transmitting an identification code that is or becomes associated with the ticket (e.g., is at least partly read from or written onto the ticket). The identification code is at least substantially unique to the ticket and is transmitted over the existing communications network **60** to the ticket information manager **70** or to a data store associated with the ticket information manager **70**. If the system is such that the ticket already has a preprinted or recorded identification number, the ticket information manager compares this number with the numbers of tickets that it has previously distributed to sellers as one step in determining validity. If the ticket has a valid number that has not already been processed, the ticket information manager records the ticket's number, noting for example in a data memory that the ticket has now been purchased and should be authorized for use. Other information is also preferably recorded, including at least the purchase price and the date of the sale transaction (step **132**). The ticket information manager preferably acknowledges by communication back to the seller that the ticket is valid and now has been initialized (step **133**), although the acknowledgement can be deferred or accomplished off line.

The seller then accepts payment **31** from the purchaser **30** (who might or might not be the ultimate ticket user). At some point, the seller transfers payment **21** to the ticketing program manager, preferably through a financial network such as a credit card network. If a credit card network is used, funds can be automatically transferred to an escrow account maintained with the credit card company for the ticketing program manager. Although the seller could have previously paid the ticketing program manager in full for the tickets and then resells them to customers, it is preferable that payment to the ticketing program manager's escrow account is made from funds received from the customer. Therefore, payment is transferred to or for the benefit of the ticketing program manager when payment is tendered by the customer. The payment to the ticketing program manager (or it's escrow account) is the payment tendered, less a portion of the sale price that is due to the seller (step **134**) in consideration of making the sale.

In an embodiment wherein the communication network **60** is an existing credit card network, credit can be transferred immediately to the ticketing program manager's account. In another embodiment, the initialization process can take place over the Internet, e.g., via a secure web page

10

hosted by the ticketing program manager or another party providing account transfer services. For example, payment to the ticketing program manager's escrow account can be effected through available Internet payment mechanisms such as Pay Pal, which provides for value transfer to user's accounts. Otherwise, the seller **20** can remit funds owed to the ticketing program manager **95** on an invoiced or other basis. Because the initialization of the ticket (steps **131–133**) must be done through the ticket information manager **70**, an exact, up-to-date record is maintained of how many tickets each seller has sold, and at what price. This facilitates accountability and correct payment to the ticketing program manager or into its escrow account.

Once a customer has purchased a ticket, the ticket may be used by the purchaser **30** or by someone to whom the purchaser has conveyed the ticket, for example as a premium or as a gift for redemption, etc. The ticket is used as a representation of value used as remittance at any of the agreed service providers **80**. (In as much as the user **35** might or might not be the same party as the purchaser **30**, for the purpose of this description, the term "user" should be construed to encompass an initial purchaser or anyone to whom the purchaser has conveyed the ticket.)

A ticket user **35** presents the ticket to a service provider at step **150** in order to redeem the indicated service. At step **151**, the service provider preferably verifies the validity of the ticket by data transfer with the ticket information manager **70** over the communications network **60**. If the communications network is one that is maintained by a credit card provider, the credit card provider's equipment would recognize the unique identification code as being not an ordinary credit card but a one-time-use ticket and would contact the ticket information manager to perform verification of both the service provider's inclusion in the program and the validity of the individual ticket. As a first check, the ticket information manager will verify that the service provider is among those who have agreed to accept the tickets. (Step **152**) This may be accomplished by the storage of an inclusion table by the ticket information manager. If the communications network is also a credit card network, the initial screening for whether a service provider is listed in an inclusion table can also be made by the credit card service provider. The unique identification code associated with the ticket is then transmitted to the ticket information manager. At step **153**, the ticket code is compared with a list of codes stored in a data base maintained by (or for) the ticket information manager, namely a list of valid ticket codes for initialized but as-yet-unused tickets. If the ticket code is valid and the ticket has not yet been used, the ticket information manager returns a message to the service provider (via the credit card network if employed as part of the system) that the ticket is valid, indicating that the user may redeem a single use of the service provider's services, such as the aforementioned round of golf, day of skiing or treatment at a health spa or the like. The ticket information manager then records data referenced to the ticket code to represent that the ticket has been used, so that the ticket may not be used validly again (step **154**).

By communicating to the service provider **80** that the ticket is valid, the ticket information manager **70** basically indicates that the ticketing program manager **95** will remit payment **81** to the service provider **80** the purchase price of the service for which the ticket user **35** has presented the ticket. If a credit card provider is serving as the financial network and the communications network, the ticket information manager can signal the credit card provider to release funds from an escrow account maintained for the ticketing

US 7,066,383 B2

11

program manager directly to the service provider's account. To facilitate validation, it is possible for a service provider that offers various services to report to the ticket information manager that a particular service is being redeemed, whereby the ticketing program manager can account for the amount to be remitted. Finally, the ticket information manager sends a notification to the financial network that a ticket has been redeemed, at which point the financial network provider transfers payment **81** from the ticketing program manager's account to the service provider's account. (Step **155**).

In the embodiment wherein the communications network **60** is (or links with) an existing credit card network, credit for the funds may be transferred from the ticketing program manager (or its escrow account maintained by the credit card network) to the service provider's account immediately in the same way as a credit card transaction, but customer is not privy to the accounting details of price and the like, and preferably is not required to present identification or sign receipts or the like, because the monetary transaction is between the ticketing program manager and the service provider.

Although a credit card network can be used, the communications network can be another public or private data communications network, such as an Internet connection to a web page hosted by (or for) the ticket information manager or alternatively by the ticketing program manager. The ticketing program manager can transfer funds to the service provider using a variety of Internet-based services, such as Pay Pal, Bill Point, etc. Otherwise, the ticketing program manager can make payment by check or other means to service providers on a periodic basis to account for the number of users that have used that service provider's services since last payment. It will be recognized that the separate functional blocks depicted in FIG. **1** as ticket information manager **70** and ticketing program manager **95** may be performed by the same entity. It should be recognized that an escrow account cam be maintained either by the ticketing program manager as depicted in FIG. **1** or by the financial network **90** on behalf of the ticketing program manager.

If, at step **153**, the ticket information manager determines that the ticket does not have a valid identification code, or has a code for a ticket that has already been used once, then a message is returned to the service provider indicating that the ticket is not valid and that the service provider should not accept the ticket as payment for services. A similar message would result if, at step **152**, the ticket information manager does not recognize the service provider as one who has agreed to participate in the prepaid leisure activity services system. That is, the service provider is not listed in the ticket information manager's inclusion table.

It is an aspect of the invention that the gift ticket carries information and functions as a means for the user to obtain and remit for an incremental service, as opposed to an incremental sum of money. The various service providers may actually charge different amounts for services. A given service provider may assess different charges at different times. Likewise the retailer that originally sold the ticket to the customer may have more or less of a markup. From the user's standpoint, the system treats the ticket as the means to provide an increment of services (or possibly goods) apart from these pricing considerations, which is advantageous. At step **160**, after the system has been in operation for some period of time, the ticketing program manager can compare and reconcile any overage/underage on proceeds received on tickets presented for higher or lower priced service providers

12

and/or sold by sellers with higher or lower markups, and adjust pricing and payment strategies or provider membership arrangements, if necessary. These differences are absorbed and averaged by the ticketing program manager, who can make certain decisions about how the system is run and priced. For example, the ticketing program manager may decide based on experience to adjust the sale price of future tickets or may determine that certain sellers and/or providers will or will not become or remain active, competition and supply and demand causing the market to reach an equilibrium. However, because the gift ticket represents credit for a service and not a monetary value to the users, a change in price for new ticket purchases will not affect the redeem-ability of tickets already purchased.

In another embodiment of the invention, the purchasers or ticket users are provided a capability to add a limited amount of incremental value to the ticket (an upgrade), either at time of purchase or at any time after purchase and prior to redemption of the ticket for services (step **140**). The addition of incremental value can be employed at least two ways. The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another method, additional incremental value is used to allow the user to redeem the ticket to accommodate providing the service to additional guests at the time of redemption, for example, so that the user and a guest or guests can pay for all of their rounds of golf on the ticket. According to a preferred arrangement, a ticket with additional incremental value, like an initial ticket, cannot be presented on more than one occasion. Instead, the ticket is marketed and used as a one-time-use ticket for a given service, and adding increments refers to adding (or perhaps changing) the service that is provided when the single use is redeemed by one or more associated users. It will be recognized that the incremental upgrades for higher-priced service providers and for allowing additional guests can also be combined to allow either or both options as part of the method.

The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial

US 7,066,383 B2

13

value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another embodiment of the invention, a user can purchase additional incremental value directly from the ticketing program manager, or an agent of the ticketing program manager. This can be implemented in various ways, including via telephone or the Internet.

A telephone-based method for allowing purchase of additional incremental value can be implemented either with "live" operators who respond to users' telephone calls or with Interactive Voice Response (IVR) equipment. In a live operator system, the operators will have access to the ticket information manager's database of ticket (and, if applicable, user) information and can search, access and modify the information via a computer terminal or like device. Another option provides for the ticket information manager (or, alternatively the ticketing program manager) to maintain an (IVR) system that is entirely computerized. Users who call to add additional value to their tickets will do so by entering numbers on the telephone keypad, in response to computer-generated messages, such as "Please enter 1 to add value to your ticket. Now enter your 16 digit ticket number followed by the pound sign." Ticket information can be read back to the user with voice simulation or prerecorded messages stored as a part of the IVR system. It is also possible to combine live and IVR systems so that users have the option of performing the transaction with a person or a computer.

A further embodiment of the system provides for Internet-based account management. The ticket information manager (or, alternatively the ticketing program manager) can maintain computers connected to the Internet and programmed to allow users to access and update ticket information or upgrade ticket value via a web page. The web address can be preprinted on the tickets or on the packaging with which the tickets are sold. Upon entering the ticket information manager's secure web site, users will be asked to enter the unique identification code of their ticket. The ticket information manager's computer will check the ticket number against the database of valid ticket numbers and if the number is valid, allow the user to add value to the ticket, and pay for the transaction through a standard credit card. The ticket information manager's database will then be updated to reflect the additional value added to the user's ticket and credit will be added to the ticketing program manager's account. In an Internet-based option, the user can also use the Internet to simply verify ticket value or expiration date and once connected to the ticket information manager's web page also search for service providers in the user's locality, or in a travel destination where the user expects to redeem the ticket. This feature gives added value to service providers since the web access gives the service providers an opportunity to provide web page links with customized advertising or other information in addition to standard information provided by the ticketing program manager's web site.

In any embodiment of the invention that allows user retrieval of ticket information, the actual cash value that has

14

been purchased in connection with the ticket is never available to the user, only the number of incremental credits loaded onto the ticket.

Those skilled in the art will recognize that the ticket information manager's database can be set up to store information beyond the ticket number and value associated with a ticket. For example, user identification information such as name, address and e-mail address can be stored at the time a user purchases a ticket. Storage of this information would, for example, allow the ticketing program manager to replace a lost ticket upon presentation by the user of such personal identification information. The ticket information manager can search its database for a user's name and determine whether the user's ticket has been redeemed. If the ticket has not yet been redeemed, then the lost ticket number can be canceled and a new ticket issued to the user. This transaction could be implemented either in person through a seller or with the ticketing program manager (or, alternatively, the ticket information manager) via telephone or the Internet as described above. Recordation of user information can also provide a valuable feature to service providers who, if given access to such information (either for a fee or by other agreement with the ticketing program manager) can access that information for marketing purposes, and can target marketing specifically to users who have redeemed their tickets at that particular service provider.

In the case where a ticket can have additional incremental value added, part of step **153** would include not only verifying that the ticket is valid, but determining the total value of the ticket. Again, the ticket's value as seen by a user is not intended to be in monetary units, but incremental credits. For example, a ticket may be initialized with one credit at time of sale (a base value), and be valid for a single use at all service providers who accept the base value. Additional credits can be fractions of the base value. For example, additional increments might be one quarter of the initial value. A user can then purchase four additional increments to take a guest if that is a feature of the system, or might purchase only the number of incremental credits to be able to use the ticket at a service provider who does not accept the base value of the ticket. In this embodiment of the invention, the service provider will verify the ticket's validity and its value at time of redemption. Because the ticket is a one-time-use ticket, any additional value on the ticket that exceeds that needed for the user to redeem the service will be lost to the user.

What is claimed is:

1. A method for provision of prepaid services, comparing the steps of:

(a) distribution and sale of one-time-use tickets, each possessing a substantially unique identification code and representing an initial value to be remitted for a single use of a desired service, each said ticket to be valid for a single use at any one of a plurality of service providers;

(b) purchase of at least one said ticket by a customer;

(c) activation of said ticket by a seller thereof, said activation comprising communication with a ticket information manager that a particular ticket has been sold and validation by the ticket information manager of the unique identification code of the ticket;

(d) transfer of a predetermined amount from the purchase price in favor of a ticketing program manager;

(e) presentation of the ticket by a ticket-holder to one of the plurality of service providers for redemption in exchange for a single use of the desired service from

US 7,066,383 B2

15

said one of the service providers, said one of the service providers being selected by the ticket-holder among the plurality of service providers;

(f) wherein the ticket is redeemable at any one of said plurality of service providers for said single use, although a price debited for said service by at least certain of said service providers is different from a price debited by others of said service providers for the same said service;

(e) confirmation by the service provider of the ticket's validity with the ticket information manager; and

(h) payment by the ticketing program manager, at the price debited for said service by said one of said service providers, in favor of the service provider for the single use of the service;

further comprising (i) permitting optional purchase of additional incremental credit above a base ticket value on the ticket by the customer, said purchase comprising communicating an additional purchased value to the ticketing program manager and payment in favor of the ticketing program manager therefore, and presentation of the ticket by a ticket-holder to one of a plurality of service providers in exchange for use of the provider's service where the price debited for said service by said service provider can be higher than the base ticket value, wherein said additional incremental credit is also useable to redeem services from the service provider when the ticket is presented for use on a given occasion, and

wherein the ticket user can check a ticket status with the ticket information manager through a telephone connection to an interactive voice response processor having access to stored ticket data and where the ticket user is not given the monetary value associated with the ticket but the number of incremental credits purchased to date.

2. The method of claim 1, wherein at least one of said, activation, optional purchase and confirmation steps includes transmission and reception of said communications over an interactive voice response system.

3. The method of claim 1, wherein at least one of said activation, optional purchase and confirmation steps includes the step of transmission and reception of said communications over a public data communication network.

4. The method of claim 1, wherein said one-time-use ticket has a maximum number of incremental values that may be added to the one-time-use ticket and further comprising the additional step of

(j) verifying that any additional value to be added does not exceed the maximum value.

5. The method of claim 1, wherein said one-time-use ticket is valid for redemption for a limited period of time after activation and further comprising the additional step of

(j) the service provider verifying with the ticket information manager an expiration date of the ticket and that the ticket has not been presented for redemption after the expiration date.

6. The method of claim 1, wherein purchaser information is recorded by the ticket information manager at the time of purchase and further comprising at least one said purchaser obtaining a replacement one-time-use ticket upon presentation of identification after the original said ticket is lost or stolen and has not already been accepted by a service provider.

7. The method of claim 1, wherein the ticket comprises indicia of a credit card including at least one of a printed multi-digit numerical code, an embossed multi-digit numeri-

16

cal code, a magnetic strip, a barcode and a stored encoded chip, representing a corresponding code and which is readable by use of standard credit card equipment coupled to a communication network, and wherein at least one of steps (c), (d), (g) and (h) includes transmission and reception of said data over said standard credit card equipment and network.

8. The method of claim 1, wherein said one-time-use ticket contains a recordable medium and wherein the device is blank when received by a seller and validation information and purchase data are recorded on said recordable medium in conjunction with purchase.

9. The method of claim 1 further comprising communicating between the ticketholder and the ticket information manager over a public communication network, for at least one of checking a ticket status and a number of incremental credits thereof, including access to a processor having access to stored ticket data, and wherein said communicating excludes reporting of any monetary value associated with the ticket but includes reporting a number of incremental credits purchased to date.

10. A prepaid services account management system, comprising:

(a) a data processing platform associated with a merchant payment network;

(b) means for receiving from a ticket distributor and storing for access by the data processing platform, a communication identifying a ticket with a substantially unique identification code;

(c) wherein the data processing platform comprises at least one processor programmed for comparing the identification code with a list of such codes for tickets that have been distributed by a ticketing program manager;

(d) a database memory accessible to the data processing platform for storing information indicating that a ticket with a particular said code has been purchased, and also for storing an indication of whether the ticket has been redeemed;

(e) means for receiving from a service provider that is an authorized participant in the merchant payment network, a communication identifying a ticket with a unique identification code;

(f) a database memory for storing an inclusion list identifying among all service providers that are authorized participants in the merchant payment network, a subset of participants that are authorized service providers for at least one service;

(g) at least one processor programmed for comparing a unique identification code received from a source provider with a list of codes for tickets that have been sold and accessing the database memory;

(h) means for communicating with a service provider that is in the inclusion list and to whom a ticket has been presented for redemption that the ticket with said identification code is validly redeemable for a single use of a desired service, wherein said service provider is selected by ticket-holder among said subset of participants of the inclusion list, and marking the data base memory to shown that the ticket has been used a single time; and

(i) wherein the processor is programmed to credit the service provider for redemption of the ticket and to signal refusal if the database indicates that the ticket is not properly redeemable as presented, and

wherein a ticket-holder can check a ticket's status with the ticket information manager by access to an Internet site

US 7,066,383 B2

17

connected to a processor coupled to stored ticket data, and wherein the processor is programmed to report a number of incremental units associated with the ticket, while refraining from reporting an associated purchase value thereof.

**11**. The system of claim **10**, further comprising:

(j) means for determining whether the ticket presented to the service provider has exceeded an expiration date.

**12**. The system of claim **10**, further comprising:

(k) means for the user to purchase additional incremental value on said ticket;

(l) means for the data processing platform to store information indicating the addition of value to the ticket; and

(m) means for a service provider to verify through communications with the data processing platform the amount of additional incremental value added to the ticket.

**13**. The system of claim **10**, wherein at least one of (c) and (g) includes transmission and reception of communications over an interactive voice response system.

**14**. The system of claim **10**, wherein at least one of (c) and (g) includes transmission and reception of communications over a public data network.

**15**. The system of claim **10**, wherein said one-time-use ticket is valid for redemption for a limited period of time after activation, and further comprising

the service provider verifying with the account manager the expiration date of the ticket and that the ticket has not been presented for redemption after the expiration of the limited time period.

**16**. The system of claim **10**, wherein purchaser information is recorded by the ticket information manager at the time of purchase and said purchaser may obtain a replacement one-time-use ticket upon presentation of proper identification if the original is lost or stolen and the original has not already been accepted by a service provider.

**17**. The system of claim **10**, wherein the ticket contains indicia of a credit card comprising at least one of a printed numerical code, an embossed 16 digit unique numerical code, and code represented by at least one of optical, magnetic and electronic encoding, which code is readable using standard point of sale equipment and wherein at least one of (c), (d), (g) and (h) includes transmission and reception of communications over a standard credit card network.

**18**. The system of claim **10**, wherein said one-time-use ticket contains a recordable medium such as a magnetic strip and wherein the recordable medium has a blank area when received by a seller, and wherein validation information and purchase data are recorded on said recordable medium in conjunction with purchase.

**19**. A prepaid services account management system, comprising:

18

(a) a data processing platform associated with a merchant payment network;

(b) means for receiving from a ticket distributor and storing for access by the data processing platform, a communication identifying a ticket with a substantially unique identification code;

(c) wherein the data processing platform comprises at least one processor programmed for comparing the identification code with a list of such codes for tickets that have been distributed by ticketing program manager;

(d) a database memory accessible to the data processing platform for storing information indicating that a ticket with a particular said code has been purchased, and also for storing an indication of whether the ticket has been redeemed;

(e) means for receiving from a service provider that is an authorized participant in the merchant payment network, a communication identifying a ticket with a unique identification code;

(f) a database memory for storing an inclusion list identifying among all service providers that are authorized participants in the merchant payment network, a subset of participants that are authorized service providers for at least one service;

(g) at least one processor programmed for comparing unique identification code received from a service provider with a list of codes for tickets that have been sold and accessing the database memory;

(h) means for communicating with a service provider that is in the inclusion list and to whom a ticket has been presented for redemption that the ticket with said identification code is validly redeemable for a single use of a desired service, wherein said service provider is selected by a ticket-holder among said subset of participants of the inclusion list, and marking the database memory to show that the ticket has been used a single time; and

(i) wherein the processor is programmed to credit the service provider for redemption of the ticket and to signal refusal if the database indicates that the ticket is not properly redeemable as presented, and

wherein the ticket user can check a ticket's status with the ticket information manager through a telephone connection to an interactive voice response processor having access to stored ticket data, and wherein the processor is programmed to report a number of incremental units associated with the ticket, while refraining from reporting an associated purchase value thereof.

\*   \*   \*   \*   \*

# Exhibit B



US007156294B2

(12) **United States Patent**

Roth

(10) Patent No.: **US 7,156,294 B2**

(45) Date of Patent: **Jan. 2, 2007**

(54) **SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS**

(75) Inventor: **Anthony G. Roth**, Newburyport, MA (US)

(73) Assignee: **UTIX Group Incorporated**, Burlington, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/204,803**

(22) Filed: **Aug. 15, 2005**

(65) **Prior Publication Data**

US 2005/0274795 A1    Dec. 15, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/827,737, filed on Apr. 20, 2004.

(51) **Int. Cl.**
*G06F 17/00*    (2006.01)

(52) **U.S. Cl.** ...................... **235/375**; 235/383; 235/379; 235/381; 705/14; 705/39; 705/69

(58) **Field of Classification Search** ................ 235/375, 235/383, 379, 381; 705/14, 39, 69
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,949,256 A | 8/1990 | Humble | |
| 5,903,633 A | 5/1999 | Lorsch | |
| 6,192,113 B1 | 2/2001 | Lorsch | |
| 6,422,462 B1 | 7/2002 | Cohen | |
| 6,594,640 B1 | 7/2003 | Postrel | |
| 2003/0050041 A1 | 3/2003 | Wu | |
| 2003/0053609 A1 | 3/2003 | Risafi et al. | |
| 2003/0194988 A1 | 10/2003 | Knox | |
| 2004/0011864 A1 | 1/2004 | Thompson et al. | |
| 2004/0093633 A1 | 2/2004 | Nicholson | |
| 2004/0068437 A1 | 4/2004 | McGee et al. | |
| 2004/0133511 A1 | 7/2004 | Smith et al. | |
| 2004/0158493 A1 | 8/2004 | Nicholson | |
| 2005/0033639 A1 | 2/2005 | Myers | |

*Primary Examiner*—Ahshik Kim
*Assistant Examiner*—Allyson N Trail
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57) **ABSTRACT**

One-time-use tickets containing a unique identification code that allow for prepayment of entertainment or personal services are distributed and sold. When a ticket is sold, it is activated by the seller notifying a ticket information manager of its sale, at which time the ticket's unique identification code is recorded by the ticket information manager. Part of the sale price is transferred by the vendor to an account maintained by a ticketing program manager. Ticketholders present the ticket for redemption of the particular service from an agreed service provider. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated. While the purchase price of the ticket is fixed, service providers will receive their agreed payment price from the ticketing program manager's account when a ticket user redeems a ticket regardless of whether that price is higher or lower than the ticket purchase price.

**36 Claims, 2 Drawing Sheets**

Prepaid Services System 10



**FIGURE 1**

Prepaid Services System  10





**FIGURE 2**

<u>Prepaid Services Method</u>

Step 100
Establish agreed service provider network

Step 110
Establish seller network

Step 120
Distribute tickets to sellers

Step 130
Sell tickets to purchasers

Step 131
Seller contacts ticket information manager

Step 132
Ticket information manager confirms ticket valid & stores information

Step 133
Ticket information manager notifies Seller ticket is valid

Step 134
Seller sends funds to ticketing program manager

Step 140
User can add incremental value to ticket if desired

Step 150
User redeems ticket at service provider

Step 151
Service provider contacts ticket info. manager

Step 152
Ticket info. manager checks vendor inclusion table

Step 153
Ticket information manager checks if ticket is valid

Step 154
If ticket is valid, ticket information manager updates data and notifies service provider

Step 155
Ticketing program manager sends funds to service provider

Step 160
Ticketing program manager reconciles income & adjusts ticket prices accordingly

US 7,156,294 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/827,737, filed Apr. 20, 2004, the entire teachings of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The invention relates to marketing and distributing services, especially participatory sports or entertainment services, by collecting a prepayment and issuing to a customer a ticket or similar indicia that can be redeemed for a particular service. The service is one that can be obtained at the customer's option from any of a plurality of distinct service providers, including providers that normally charge more or less than others for the particular service involved. The invention further involves accounting for the usage and payment for services on this basis.

## BACKGROUND OF THE INVENTION

Goods and services are typically obtained in exchange for payment and the payment might be rendered in various ways and in various amounts, such as by tender of cash currency, funds transfer between accounts, debit card purchase and exhaustion, credit arrangements involving future payment, barter or various other techniques. The particular goods or services that a customer might obtain from different providers differ. The reputations of providers differ. The manner of providing services, such as the time of day or as a function of demand or other aspects also differ. Importantly, the providers also demand different prices.

The differences between available offerings of goods and services generally boil down to differences in the costs and benefits of available goods and services that consumers have the option to choose. The costs and benefits of the possible choices are judged and compared by customers when making purchasing decisions. The customers seek the greatest benefit per unit cost and are free to make selections among a variety of different providers' offerings and terms, or even to substitute one type of service for another according to the customer's needs.

The relative merits and different options are perceived differently by different consumers, such that some consumers are willing to pay more or less than others for particular aspects of goods or services. The confluence of offerings (including what is offered and the terms of payment) with the selections made by consumers is the nature of the market of supply and demand by which resources are allocated among consumers in a market economy.

Not all consumer transactions are classic exercises of supply and demand wherein the customer has the utmost control and choice among differing alternatives with incrementally different costs and/or different pricing and payment arrangements. One example is a vendor's prepaid gift indicia, which can take various forms ranging from an authorized numbered slip bearing the vendor's name and a dollar amount to plastic cards bearing the vendor's logo and having a magnetically readable strip with a predetermined dollar value, each redeemable at the vendor's sales outlets. A prepaid gift indicia is generally issued by a particular retailer and can only be redeemed at that retailer's facilities. In this situation, the person who purchases the gift indicia may exercise a degree of choice, but the person who redeems it (typically the recipient of the gift) has no choice except to use the issuing retailer as the provider. Inasmuch as the issuer and the provider are the same entity, the issuer/provider has full control of the extent to which the selling price of the gift card corresponds to the offering price of the goods or services that are delivered. It is conceivable that the issuer/provider may include a premium or discount to encourage patronage and/or purchase of gift indica, but within the control of the issuer/provider, the goods or services are provided in exchange for an amount that is related to the issuer/provider's pricing schedules.

It its known that providers of personal entertainment and sporting services, can issue a gift ticket that represents an incremental cash value or an incremental quantity of their services. This is possible because pricing and terms upon the sale of the gift ticket are controlled by the same party that controls the nature, quality and delivery terms of the services. As a result, the issuer/provider can issue a gift ticket for a given cash value or for a given increment of services. Thus a gift ticket or coupon might be granted for one pass to a matinee show or one Saturday afternoon bowling game, presumably with the ticket priced at an amount related to the pricing of the associated service. If the gift ticket is not defined as equal to a given service and/or if the issuer offers different services at different prices, then the gift ticket is denominated as a cash value and the user is entitled to deduct from the value on the ticket when paying for services, until the value associated with the ticket is exhausted.

It would be advantageous if a convenient arrangement could be organized whereby different potentially-competing suppliers of services can all honor a coupon or gift ticket or similar indicia of value that is denominated not in a monetary value but as as a particular service. It is not possible for the purchaser of a gift ticket for a given increment of services from one establishment to redeem the gift ticket at another establishment for comparable services, because the services are not likely to be of the same value to consumers, or offered at the same price by suppliers. If such a system were envisioned, it would necessarily involve exchanges of cash value and not transactions for a given increment of services regardless or where it is obtained.

A gift ticket system might be envisioned where one can buy a gift ticket for an incremental entertainment service (a single movie showing, for example), but if that gift ticket was to be redeemable at any of a plurality of competing different movie theaters, some provision would be needed to account for the fact that some theaters are more comfortable, have larger screens and better sound systems and consequently have higher ticket prices than others. Such an arrangement would not likely be practical, or at least would be less practical than using cash currency, and would require a network of behind-the-scenes fund transfers in varying amounts per transaction, between establishments at which the gift tickets are sold to customers and establishments at which the customer redeems the tickets for more or less expensive entertainment services. On the other hand, one could issue gift tickets for an incremental amount of money, leaving it to the consumer to decide where to expend the gift ticket, either wholly or in some successive number of transactions that each represent less than the full initial cost of the gift ticket.

Gift tickets can resemble debit cards and be presented by customers for deduction of an incremental monetary value in exchange for goods or services of that cost. It is known to have the representation of value carried on the card itself (e.g., in the case of a "smartcard" having security aspects).

US 7,156,294 B2

3

Alternatively, it is known to have the card carry a serial number or address associated with a record stored in a database in communication with points of sale. These arrangements also require behind-thescenes transfer of funds among the entities selling the cards, perhaps the customer, and the entities at which the card is redeemed for goods or services.

It is known that credit cards can be issued that may be selectively limited to certain vendors, either by the users (to limit purchases by their children or others to whom the cards are lent) or by corporations (for example to employees' limit meal and entertainment expenses to certain establishments). See Cohen, U.S. Pat. No. 6,422,462 "Apparatus and Methods for Improved Credit Cards and Credit Card Transactions." Such cards are still redeemable, however, for the cash value of purchases made and the users are still responsible for paying for transactions on an as-used basis.

An arrangement that requires such a network of funds transfers is actually already in place. Credit card systems including Visa, MasterCard, Discover, American Express, etc., deal with goods/services providers across the board. They are available for the most part to any customer and to any supplier. However, existing credit card systems work because there is a medium of exchange, namely dollars and cents (or other currencies), that is the same as to all suppliers and all possible goods and services. There is no practical way in which to supply a given service, such as a round of golf or a theater ticket, that is free of association with a particular supplier and might be redeemed by the customer at any of a plurality of possible suppliers, even though their pricing may differ, without relying on a backup funds transfer network associated with the point of sale.

SUMMARY OF THE INVENTION

An inventive system and method arrange for prepayment by a customer of a predetermined sum for indicia such as a one-time-use gift ticket. The ticket is redeemable for a particular incremental quantity of services, as opposed to a cash value. The ticket is redeemable at any of a plurality of different providers that offer services that might be more or less similar but that qualify as the stated sort of services. The system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., a movie pass (at any participating theater), a round of golf (at any participating golf course), a spa treatment (at any participating spa), etc.

The providers are independent entities that determine the nature of their own offerings and set their own prices. The gift ticket issuer enlists a number of suppliers of services to be obtained by redemption of the ticket for services, each having offerings that have character, terms and pricing arrangements that are approximately equal but may differ up to some threshold. Enlisted service providers agree to participate in the program and agree to accept the prepaid gift ticket as a payment method.

According to an inventive aspect, the enlisted service providers are not required to accept some standard or negotiated amount that is less than their regular price for services of the type that are delivered. Instead, the service providers accept for payment one time use tickets and process the sale to the customer over an existing credit card network or as some other financial transaction (including such instant payment systems as Pay Pal, which allows secured payment directly out of an existing bank account) in which the account that is debited is the account of the entity that issued the one-time-use ticket.

4

Gift tickets are sold through sales outlets, through the Internet, by telephone or in large blocks to institutional purchasers. Participating merchants whose services may be redeemed through the gift ticket system can also be empowered to sell the tickets. The tickets can be retail items of purchase that are activated at the point where the tickets are sold to customers.

The customers can use the gift tickets to redeem a stated increment of services for themselves or can present the ticket as a gift. The system is particularly applicable for use in giving gifts or employee awards or incentives, because the emphasis is wholly on redemption for the services and not on redemption of a given cash value.

Gift tickets each contain a unique identification code and are loaded with a predetermined value identified as a one-time use at any customer-chosen one of the service providers who have agreed to participate and who provide the pertinent goods or services that are identified when the ticket is sold.

When a ticket is sold, it is activated by the seller, for example by scanning a bar code associated with a uniform product code or by swiping a magnetic strip on the ticket itself, and notifying a ticket information manager of its sale. At that time, the unique identification code of the ticket is noted in a memory file by the ticket information manager. A predetermined portion of the sale price (i.e. less any service fee to the vendor) can be transferred by the vendor to the ticketing program manager at the time of ticket activation. Another alternative is that the entire purchase price is credited to an account maintained by or for the ticketing program manager who then regularly compensates the vendor for its participation, either on a flat-fee basis or as some function of the number of tickets sold, including perhaps added incentives at various sales level thresholds.

Gift tickets sold over the Internet or by telephone can be mailed in an activated state or can employ security features requiring the purchaser to activate the ticket (by Internet or telephone) upon receipt, for example, by repeating a code that was given to the purchaser at the time of the sale or by repeating a password determined by the purchaser at the time of sale.

The ticket can be purchased by the ultimate user or advantageously is given by the purchaser to the end user, for example as a gift, an employee or sales incentive award, a premium item or the like. The gift ticket holder presents the ticket for redemption of the particular service from one of a plurality of agreed service providers. The identities of the agreed service providers can be stored in an inclusion table that is employed by a ticket information manager. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated, in a transaction that is much the same as a credit card authorization, which can use the same point of sale network communications as a credit card transaction.

According to another aspect, although the gift ticket is issued as a onetime-use item, purchasers can choose to add incremental value to upgrade the ticket at the time of purchase or prior to redemption. This feature has two main applications. With the capability of adding an incremental value, it is possible to apply the invention to services of a given kind (such as a round of golf, for example) that have more than some predetermined threshold difference in value that prevents them from being peers. Thus, the invention can be applied to an arrangement in which 18 holes at an international golf course such as Pebble Beach or the Masters' course in Augusta, for example, can be regarded as

US 7,156,294 B2

**5**

distinct services from less prestigious local golf courses that represent the norm. The customer can purchase an upgrade (or several incremental upgrades if more than one is needed for a particular provider) if desired, to the higher quality level in the same category of "a round of golf," which can be redeemed at any of the venues that fall into the higher classification.

Alternatively or in addition to providing upgrades for moving upwardly between two or more classes of a given service that might render two alternatives as peers, the holder of a ticket can be permitted to obtain an upgrade that arranges a ticket issued for one person for a given class of services to be redeemable for more than one person, within the same class of services.

Upgrades as described can be purchased in a manner similar to the initial transaction at which the ticket was originally offered and sold. Alternatively, sales of upgrades can be made in various other ways, such as through an Internet web site with the use of a credit card or by touch tone telephone through an Interactive Voice Response system connected to the ticket information manager's data storage system.

It is an aspect of the system and method that the purchase price of the gift ticket is fixed, but the ticket holder can redeem the ticket at any of a plurality of providers of a given service, even though the service providers may normally assess different prices. The service providers are credited in the redemption process with their agreed payment price from the ticketing program manager, so that the provider is paid in a normal manner when a ticket user redeems a ticket for a service. In this way, ticket holders are fully as welcome at the provider's establishment as a customer that might remit cash currency when obtaining the same service. In one embodiment of the system, the ticket is recognized by an existing credit card system such as American Express, Visa, Master Charge, Discover, etc. (particularly, Discover, which currently has the capability to distinguish among vendors in an inclusion list), and can be swiped in existing point of sale terminals, thus allowing for familiar use by the service provider and instant payment to the service provider's account. The service provider is credited for the price of its services in the usual manner of a credit card network, but unlike the usual credit card transaction, a charge is not levied against the user's account, but is debited against an account held by the ticketing program manager.

A system is also disclosed to implement the marketing, sale, redemption and account management of a one-time-use gift ticket for prepaid entertainment or personal services.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments of the invention, as illustrated in the accompanying drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

FIG. 1 is a stylized block diagram overview of a prepaid services system according to the invention; and,

FIG. 2 is a flow diagram illustrating steps of an exemplary embodiment and method of administering a prepaid services system.

**6**

DETAILED DESCRIPTION OF THE
INVENTION

Referring to FIG. 1, a stylized overview of a prepaid services system, 10, is provided. As described herein, the prepaid services system 10 includes seven primary parties: seller 20, purchaser 30, ticket user 35, ticket information manager 70, service provider 80, financial network 90 and ticketing program manager 95.

Referring to the flow diagram of FIG. 2, at step 100, a ticketing program manager 95 desiring to implement the one-time-use gift ticket system of the invention, especially for a particular type of entertainment or personal service but also potentially for sale of goods, enlists a plurality of providers 80 of one or more substantially comparable services. The ticketing program manager 95 negotiates if necessary with the providers to honor the one-time-use ticket 40 according to the procedures described herein, namely to accept the ticket in exchange for provision of the provider's regular services and to seek remuneration for such services from the system maintained by or for the ticketing program manager.

It is advantageous for the ticketing program manager who enlists the service provider to bring the provider on as a member of a common group enterprise including, for example, advertising the enterprise and the provider's membership in the enterprise and the like. Likewise, membership in the enterprise can benefit individual providers, through additional advertising, access to new clientele and association with a product (the one-time-use ticket) that may be promoted as having a certain desirable cachet in and of itself. Additionally, it is desirable that the service providers accept the ticket at all times they are open, so that a "no-blackouts" feature of the gift ticket will enhance its acceptance in the marketplace and add to the desirability of receiving such a pass as a gift. However, it is not strictly necessary for the provider to undertake any particular responsibilities other than to provide the same services to gift ticket users as the provider provides to regular cash customers.

In this exemplary illustration of the invention, plural service providers 80 all provide at least one same stated service or article of goods, for example a round of golf, a day's worth of skiing or treatment at a health spa or the like. A broad network of providers of like services who accept the one-time-use ticket improves the marketability of the ticket, since the ability for the user to select among a variety of convenient providers is a desirable feature and one which differentiates the ticket in the present invention from ordinary gift cards or other indicia redeemable only at the retailers from whom it was purchased. It is also expected that the various providers will provide somewhat different services and may assess different charges, up to a threshold of difference within which the providers are considered to provide the "same" service as authorized and redeemable by presenting the one time use gift ticket.

Therefore, while the particular service for which a ticket is to be used is nominally the same service for that series of ticket (i.e., for tickets sold for redemption for a uniquely named or described service), the service providers need not all agree to provide identical services or to charge a dictated price for their services. Within the threshold of comparable pricing, differences in services can be accommodated owing to such factors as specific service component differences, location, prestige and quality, or other differences, as well as arbitrary consumer preferences. It is an inventive aspect of the subject system and method that service providers are not

US 7,156,294 B2

7

required to each accept identical payment value for their services, despite the fact that the gift ticket is sold for a given price and is redeemable for such services at any of the service providers.

The ticketing program manager sets the price charged by seller **20** for sale and activation of the ticket, so as to accommodate variations in actual service provider prices. One way to do this is to set the ticket price in view of the most expensive of all of the service providers, plus any service fee collected by the ticketing program manager. Another method, that advantageously allows a lower ticket price, and which can be expected to improve sales, is to set the ticket selling price near to the average charge incurred by all users of the service providers, plus costs of operating the system and a reasonable return to the ticketing program manager. Costs of operating the system can include items such as a fee to the ticket information manager for maintaining a processor to handle ticket information data storage and verification and validation of tickets and costs associated with the financial network, which might be a credit card network, in which case the credit card company might receive a portion of the sale price.

That is, the ticket selling price should be set and/or periodically adjusted so that the use of the tickets integrated over all the users and providers, has a sufficient surplus selling price over the average cost of the service (which may or may not be the same as the average provider price, given that users may frequent certain providers more than others), to provide at least a modest return on investment to the ticketing program manager. The ticket selling price is determined so that any overage that accumulates when a ticket is used to obtain the service from providers whose services are priced at less than the ticket selling price is balanced against the shortfall that arises when a ticket is used to obtain the service from providers whose services are priced higher than the ticket selling price. This calculation advantageously takes into account the extent to which users may prefer to patronize certain providers over others (e.g., providers that are perhaps more prestigious, that advertise more, that have been in business longer or that have locations that are convenient to a larger number of users). The calculation also provides for a return to the ticketing program manager over a break-even number.

After the service provider relationships have been established (step **100**) or while that is occurring, the ticketing program manager **95** establishes relationships with existing sales outlets (step **110**) who will sell the one-time-use tickets. The sellers **20** have point of sale terminals **50** connected to an existing network **60** that will allow fast, efficient communication with the ticket information manager **70**. This communication is desirable for the transfer of the information required to initialize a ticket once it has been purchased. If the existing network is connected to a financial network **90**, such as that maintained by a credit card company, this can also facilitate the automatic transfer of funds between the sellers **20** and the ticketing program manager **95** and between the ticketing program manager and service providers **80**. For example, the credit card company can maintain an escrow account for the ticketing program manager, into which funds are transferred from the sellers and from which funds are withdrawn to pay service providers. By using an existing credit card network as the financial "rail" for the system, funds transfers can be managed with minimal dayto-day involvement from the ticketing program manager. While the use of an existing credit card network as the communication network carries certain advantages it is also possible for the required communications to take place

8

over an Internet connection (for example to a secure web page hosted by the account manager) or a telephone connection to either "live" operators or an Interactive Voice Response system connected to the ticket information manager's (**70**) data storage equipment.

In one exemplary embodiment, the ticket information manager **70** has a communications link or other access to a financial network **90** which is a credit card provider's network. When a ticket is swiped on a point of sale terminal **50** at either the seller's end or the service provider's end, the credit card network will communicate with or otherwise access the ticket information manager's equipment. All ticket verification or validation and approval of service providers is handled directly by the ticket information manager. The ticket information manager simply returns an accept or reject message to the credit card network, which then either causes the transaction to be processed at the point of sale terminal or not.

In an alternative embodiment, the gift ticket issuer can be a commercial organization other than a seller, with communications equipment or the like to activate the ticket through communications with the ticketing program manager.

Once relationships with the sellers **20** and service providers **80** are established, the ticketing program manager distributes one-time-use tickets (step **120**). Preferably the tickets are distributed at first in an un-initialized state, namely functional but not yet validated for use. A validation process includes placing suitable codes or notations on the tickets or storing codes in the tickets or elsewhere in a data storage medium that is accessible over a communication network. These codes can be checked when determining whether to permit use of the tickets.

In one embodiment, the tickets have a preprinted unique identification code and a magnetic strip or other means of recording information. The strip or other means can be prerecorded with a unique or at least substantially unique identification code for each ticket. The unique identification code may be an alphabetic code, a numeric code, an alpha numeric code, or other appropriate identification code capable of uniquely identifying an individual ticket, and perhaps also identifying the related type of service (e.g., golf, spa, etc.). In an alternate embodiment, the tickets do not have a preprinted or prerecorded identification code, but do contain a recordable medium such as a magnetic strip or an electronic storage device, which might be loaded with a unique code preliminarily or may have an area in which such a code is inserted as a part of the initialization procedure.

According to an advantageous aspect, the issued ticket is configured and formatted with certain indicia characteristic of a standard credit card. This can include, without limitation, printed or embossed account identification numbers, a magnetic strip or on board integrated circuit memory, a one or two dimensional optical bar code, etc. The information can be prerecorded or at least partly recordable. Two or more redundant means for storing the same information, such as an account number or the like, can be provided for data entry in different optional ways, of the different storage techniques can be used for information that is otherwise cross referenced. Advantageously, the ticket has sufficient information carried thereon to permit use of the ticket substantially in the same physical manner as a standard credit card, namely using equipment conventionally provided at a point-of-sale terminal **50** (scanners, magnetic strip swipe readers, keyboards, etc.).

In one embodiment, the ticketing program manager has reserved for itself a series of digits or numbers or number combinations in a standard credit card format that are unique

US 7,156,294 B2

9

to the account manager and identify one or more accounts associated with the ticketing program manager. Initialization and validation steps, which are processed by a ticket information manager 70 can be undertaken over an existing communication network 60, which advantageously is a network that processes conventional credit cards, or can be another public or private data communication network. Other types of communication devices may be used instead of or in addition to a standard point-of-sale terminal programmed to handle credit cards, so long as the device is capable of communicating sufficient ticket information over an operable communications network to effect the steps as described herein. For example, in another form of the invention, the ticket information can be transmitted between the seller and the ticket information manager by telephone either by voice in association with a live operator or through a telephone keypad to an Interactive Voice Response system.

The one-time-use ticket proceeds through several steps associated with initial issue, sale (preferably with validation concurrently upon sale), and later presentation as an identification of value used to present remittance for a service. At step 130, the purchaser 30 selects a gift ticket for purchase and pays the seller 20 some agreed purchase price 31. This transaction can be a conventional retail, wholesale or other transaction in which one or more tickets are exchanged for cash or credit or other remuneration.

At step 131, the seller 20 activates the ticket, preferably including transmitting an identification code that is or becomes associated with the ticket (e.g., is at least partly read from or written onto the ticket). The identification code is at least substantially unique to the ticket and is transmitted over the existing communications network 60 to the ticket information manager 70 or to a data store associated with the ticket information manager 70. If the system is such that the ticket already has a preprinted or recorded identification number, the ticket information manager compares this number with the numbers of tickets that it has previously distributed to sellers as one step in determining validity. If the ticket has a valid number that has not already been processed, the ticket information manager records the ticket's number, noting for example in a data memory that the ticket has now been purchased and should be authorized for use. Other information is also preferably recorded, including at least the purchase price and the date of the sale transaction (step 132). The ticket information manager preferably acknowledges by communication back to the seller that the ticket is valid and now has been initialized (step 133), although the acknowledgement can be deferred or accomplished off line.

The seller 20 then accepts payment 31 from the purchaser 30 (who might or might not be the ultimate ticket user). At some point, the seller 20 transfers payment 21 to the ticketing program manager 95, preferably through a financial network 90 such as a credit card network. If a credit card network is used, funds can be automatically transferred to an escrow account maintained with the credit card company for the ticketing program manager 95. Although the seller could have previously paid the ticketing program manager 95 in full for the tickets and then resells them to customers, it is preferable that payment to the ticketing program manager's escrow account is made from funds received from the customer 30. Therefore, payment 31, 21 is transferred to or for the benefit of the ticketing program manager when payment is tendered by the customer 30. The payment 21 to the ticketing program manager (or it's escrow account) is the payment tendered, less a portion of the sale price that is due to the seller (step 134) in consideration of making the sale.

10

In an embodiment wherein the communication network 60 is an existing credit card network, credit can be transferred immediately to the ticketing program manager's account. In another embodiment, the initialization process can take place over the Internet, e.g., via a secure web page hosted by the ticketing program manager or another party providing account transfer services. For example, payment to the ticketing program manager's escrow account can be effected through available Internet payment mechanisms such as Pay Pal, which provides for value transfer to user's accounts. Otherwise, the seller 20 can remit funds owed to the ticketing program manager 95 on an invoiced or other basis. Because the initialization of the ticket (steps 131–133) must be done through the ticket information manager 70, an exact, up-to-date record is maintained of how many tickets each seller has sold, and at what price. This facilitates accountability and correct payment to the ticketing program manager or into its escrow account.

Once a customer has purchased a ticket, the ticket may be used by the purchaser 30 or by someone to whom the purchaser has conveyed the ticket, for example as a premium or as a gift for redemption, etc. The ticket is used as a representation of value used as remittance at any of the agreed service providers 80. (Inasmuch as the user 35 might or might not be the same party as the purchaser 30, for the purpose of this description, the term "user" should be construed to encompass an initial purchaser or anyone to whom the purchaser has conveyed the ticket.)

A ticket user 35 presents the ticket to a service provider at step 150 in order to redeem the indicated service. At step 151, the service provider preferably verifies the validity of the ticket by data transfer with the ticket information manager 70 over the communications network 60. If the communications network is one that is maintained by a credit card provider, the credit card provider's equipment would recognize the unique identification code as being not an ordinary credit card but a onetime-use ticket and would contact the ticket information manager to perform verification of both the service provider's inclusion in the program and the validity of the individual ticket. As a first check, the ticket information manager will verify that the service provider is among those who have agreed to accept the tickets. (Step 152). This may be accomplished by the storage of an inclusion table by the ticket information manager. If the communications network is also a credit card network, the initial screening for whether a service provider is listed in an inclusion table can also be made by the credit card service provider. The unique identification code associated with the ticket is then transmitted to the ticket information manager. At step 153, the ticket code is compared with a list of codes stored in a data base maintained by (or for) the ticket information manager, namely a list of valid ticket codes for initialized but as-yet-unused tickets. If the ticket code is valid and the ticket has not yet been used, the ticket information manager returns a message to the service provider (via the credit card network if employed as part of the system) that the ticket is valid, indicating that the user may redeem a single use of the service provider's services, such as the aforementioned round of golf, day of skiing or treatment at a health spa or the like. The ticket information manager then records data referenced to the ticket code to represent that the ticket has been used, so that the ticket may not be used validly again (step 154).

By communicating to the service provider 80 that the ticket is valid, the ticket information manager 70 basically indicates that the ticketing program manager 95 will remit payment 81 to the service provider 80 the purchase price of

US 7,156,294 B2

11

the service for which the ticket user **35** has presented the ticket. If a credit card provider is serving as the financial network and the communications network, the ticket information manager can signal the credit card provider to release funds from an escrow account maintained for the ticketing program manager directly to the service provider's account. To facilitate validation, it is possible for a service provider that offers various services to report to the ticket information manager that a particular service is being redeemed, whereby the ticketing program manager can account for the amount to be remitted. Finally, the ticket information manager sends a notification to the financial network that a ticket has been redeemed, at which point the financial network provider transfers payment **81** from the ticketing program manager's account to the service provider's account. (Step **155**).

In the embodiment wherein the communications network **60** is (or links with) an existing credit card network, credit for the funds may be transferred from the ticketing program manager (or its escrow account maintained by the credit card network) to the service provider's account immediately in the same way as a credit card transaction, but customer is not privy to the accounting details of price and the like, and preferably is not required to present identification or sign receipts or the like, because the monetary transaction is between the ticketing program manager and the service provider.

Although a credit card network can be used, the communications network can be another public or private data communications network, such as an Internet connection to a web page hosted by (or for) the ticket information manager or alternatively by the ticketing program manager. The ticketing program manager can transfer funds to the service provider using a variety of Internet-based services, such as Pay Pal, Bill Point, etc. Otherwise, the ticketing program manager can make payment by check or other means to service providers on a periodic basis to account for the number of users that have used that service provider's services since last payment. It will be recognized that the separate functional blocks depicted in FIG. **1** as ticket information manager **70** and ticketing program manager **95** may be performed by the same entity. It should be recognized that an escrow account cam be maintained either by the ticketing program manager as depicted in FIG. **1** or by the financial network **90** on behalf of the ticketing program manager.

If, at step **153**, the ticket information manager determines that the ticket does not have a valid identification code, or has a code for a ticket that has already been used once, then a message is returned to the service provider indicating that the ticket is not valid and that the service provider should not accept the ticket as payment for services. A similar message would result if, at step **152**, the ticket information manager does not recognize the service provider as one who has agreed to participate in the prepaid leisure activity services system. That is, the service provider is not listed in the ticket information manager's inclusion table.

It is an aspect of the invention that the gift ticket carries information and functions as a means for the user to obtain and remit for an incremental service, as opposed to an incremental sum of money. The various service providers may actually charge different amounts for services. A given service provider may assess different charges at different times. Likewise the retailer that originally sold the ticket to the customer may have more or less of a markup. From the user's standpoint, the system treats the ticket as the means to provide an increment of services (or possibly goods) apart

12

from these pricing considerations, which is advantageous. At step **160**, after the system has been in operation for some period of time, the ticketing program manager can compare and reconcile any overage/underage on proceeds received on tickets presented for higher or lower priced service providers and/or sold by sellers with higher or lower markups, and adjust pricing and payment strategies or provider membership arrangements, if necessary. These differences are absorbed and averaged by the ticketing program manager, who can make certain decisions about how the system is run and priced. For example, the ticketing program manager may decide based on experience to adjust the sale price of future tickets or may determine that certain sellers and/or providers will or will not become or remain active, competition and supply and demand causing the market to reach an equilibrium. However, because the gift ticket represents credit for a service and not a monetary value to the users, a change in price for new ticket purchases will not affect the redeem-ability of tickets already purchased.

In another embodiment of the invention, the purchasers or ticket users are provided a capability to add a limited amount of incremental value to the ticket (an upgrade), either at time of purchase or at any time after purchase and prior to redemption of the ticket for services (step **140**). The addition of incremental value can be employed at least two ways. The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another method, additional incremental value is used to allow the user to redeem the ticket to accommodate providing the service to additional people at the time of redemption, for example, so that the user and a guest or guests can pay for all of their rounds of golf on the ticket. According to a preferred arrangement, a ticket with additional incremental value, like an initial ticket, cannot be presented on more than one occasion. Instead, the ticket is marketed and used as a one-time-use ticket for a given service, and adding increments refers to adding (or perhaps changing) the service that is provided when the single use is redeemed by one or more associated users. It will be recognized that the incremental upgrades for higher-priced service providers and for allowing additional guests can also be combined to allow either or both options as part of the method.

The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very

US 7,156,294 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another embodiment of the invention, a user can purchase additional incremental value directly from the ticketing program manager, or an agent of the ticketing program manager. This can be implemented in various ways, including via telephone or the Internet.

A telephone-based method for allowing purchase of additional incremental value can be implemented either with "live" operators who respond to users' telephone calls or with Interactive Voice Response (IVR) equipment. In a live operator system, the operators will have access to the ticket information manager's database of ticket (and, if applicable, user) information and can search, access and modify the information via a computer terminal or like device. Another option provides for the ticket information manager (or, alternatively the ticketing program manager) to maintain an (IVR) system that is entirely computerized. Users who call to add additional value to their tickets will do so by entering numbers on the telephone keypad, in response to computergenerated messages, such as "Please enter 1 to add value to your ticket. Now enter your 16 digit ticket number followed by the pound sign." Ticket information can be read back to the user with voice simulation or prerecorded messages stored as a part of the IVR system. It is also possible to combine live and IVR systems so that users have the option of performing the transaction with a person or a computer.

A further embodiment of the system provides for Internet-based account management. The ticket information manager (or, alternatively the ticketing program manager) can maintain computers connected to the Internet and programmed to allow users to access and update ticket information or upgrade ticket value via a web page. The web address can be preprinted on the tickets or on the packaging with which the tickets are sold. Upon entering the ticket information manager's secure web site, users will be asked to enter the unique identification code of their ticket. The ticket information manager's computer will check the ticket number against the database of valid ticket numbers and if the number is valid, allow the user to add value to the ticket, and pay for the transaction through a standard credit card. The ticket information manager's database will then be updated to reflect the additional value added to the user's ticket and credit will be added to the ticketing program manager's account. In an Internet based option, the user can also use the Internet to simply verify ticket value or expiration date and once connected to the ticket information manager's web page also search for service providers in the user's locality, or in a travel destination where the user expects to redeem the ticket. This feature gives added value to service providers since the web access gives the service providers an opportunity to provide web page links with customized advertising or other information in addition to standard information provided by the ticketing program manager's web site.

In any embodiment of the invention that allows user retrieval of ticket information, the actual cash value that has been purchased in connection with the ticket is never available to the user, only the number of incremental credits loaded onto the ticket.

Those skilled in the art will recognize that the ticket information manager's database can be set up to store information beyond the ticket number and value associated with a ticket. For example, user identification information such as name, address and e-mail address can be stored at the time a user purchases a ticket. Storage of this information would, for example, allow the ticketing program manager to replace a lost ticket upon presentation by the user of such personal identification information. The ticket information manager can search its database for a user's name and determine whether the user's ticket has been redeemed. If the ticket has not yet been redeemed, then the lost ticket number can be canceled and a new ticket issued to the user. This transaction could be implemented either in person through a seller or with the ticketing program manager (or, alternatively, the ticket information manager) via telephone or the Internet as described above. Recordation of user information can also provide a valuable feature to service providers who, if given access to such information (either for a fee or by other agreement with the ticketing program manager) can access that information for marketing purposes, and can target marketing specifically to users who have redeemed their tickets at that particular service provider.

In the case where a ticket can have additional incremental value added, part of step **153** would include not only verifying that the ticket is valid, but determining the total value of the ticket. Again, the ticket's value as seen by a user is not intended to be in monetary units, but incremental credits. For example, a ticket may be initialized with one credit at time of sale (a base value), and be valid for a single use at all service providers who accept the base value. Additional credits can be fractions of the base value. For example, additional increments might be one quarter of the initial value. A user can then purchase four additional increments to take a guest if that is a feature of the system, or might purchase only the number of incremental credits to be able to use the ticket at a service provider who does not accept the base value of the ticket. In this embodiment of the invention, the service provider will verify the ticket's validity and its value at time of redemption. Because the ticket is a one-time-use ticket, any additional value on the ticket that exceeds that needed for the user to redeem the service will be lost to the user.

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention encompassed by the appended claims.

What is claimed is:

1. A method for provision of prepaid services, comprising the steps of:

(a) providing service specific tickets, each ticket being valid for incremental quantity of services at any one of a plurality of service providers, incremental quantity being measured in terms of number of times of use of the ticket; and

US 7,156,294 B2

15          16

(b) enabling a variable rate redemption of the ticket for service provided by one of the plurality of service providers, by:

allowing a ticket-holder to select one of the service providers among the plurality of service providers for redemption in exchange for a unit use of a desired service from said selected service provider;

upon presentation of the ticket by the ticket-holder to the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being different from price debited by others of said service providers for the same said service, such that the ticket is redeemed at a variable rate among the plurality of service providers for said same service;

effecting payment at the price debited for said service by said selected service provider; and

absorbing any differences in prices debited by the plurality of service providers for the same service, and optionally adjusting price of the ticket redeemable for the service.

**2**. The method of claim **1**, wherein the ticket is redeemable for a certain service from the selected service provider, as opposed to a cash value.

**3**. The method of claim **1**, wherein the ticket is a one-time-use ticket.

**4**. The method of claim **3**, further comprising permitting optional purchase of additional incremental value above a base ticket value on the ticket; and presenting the ticket by a ticket-holder to one of a plurality of service providers in exchange for use of the provider's service where the price debited by said service provider can be higher than the base ticket value.

**5**. The method of claim **4**, wherein said additional incremental value is an upgrade of a service.

**6**. The method of claim **4**, wherein said additional incremental value is also useable to redeem services from the service provider for more than one person when the ticket is presented for use on a given occasion.

**7**. The method of claim **4**, wherein said one-time-use ticket has a maximum value that may be added to the ticket and further comprising the additional step of verifying that any additional value to be added does not exceed the maximum value.

**8**. The method of claim **1**, wherein the ticket is valid for redemption for a limited period of time after activation and further comprising the additional step of the service provider's verifying an expiration date of the ticket.

**9**. The method of claim **1**, wherein customer information is recorded at the time of purchase and further comprising at least one of said customer and ticket-holder obtaining a replacement ticket upon presentation of customer identification after the original said ticket is lost or stolen and has not already been accepted by a service provider.

**10**. The method of claim **1**, further comprising communicating between the ticket holder and a processor over a public communications network for checking a ticket status, said processor having access to stored ticket data, wherein said communicating excludes reporting of any monetary value associated with the ticket but includes reporting incremental credit information.

**11**. The method of claim **1**, further comprising the computer implemented step of:

(c) maintaining a listing indicating the plurality of service providers and respective services.

**12**. A method as claimed in claim **1** further comprising accounting by a card issuer being on the immediate value of each ticket upon first purchase of the ticket instead of on price debited upon ticket redemption.

**13**. A method as claimed in claim **12** wherein the first purchase is by a customer of the card issuer, the customer reselling or gifting the ticket to the ticket holder.

**14**. A method as claimed in claim **12** further enabling reporting per ticket, any combination of (i) a difference between immediate value accounted by the card issuer and price debited by service provider, (ii) date of redemption, and (iii) location of service provider at redemption.

**15**. A prepaid services account management system, comprising:

(a) means for providing service specific tickets usable in a merchant payment network, each ticket, being valid for incremental quantity of services at any one of a plurality of service providers different tickets being redeemable for different services, incremental quantity being measured in terms of number of times of use of the ticket;

(b) inclusion listing means for identifying among all service providers that are authorized participants in the merchant payment network, a subset of participants that are authorized service providers for at least one service, wherein for tickets redeemable for a same service, each ticket is redeemed at a variable rate among the authorized service providers for said same service; and

(c) processor means for:

(i) crediting the service provider at a variable rate for redemption of the ticket for a respective service, wherein price debited for said service by at least certain of the service providers is different from price debited by others of said service providers for the same service, such that the ticket is redeemed at a variable rate among the plurality of service providers for said same service,

wherein the service provider is selected by a ticket-holder among said subset of participants of the inclusion list; and,

(ii) absorbing any differences in prices debited by the plurality of service providers for the same service, and optionally adjusting price of the ticket redeemable for the service.

**16**. The system of claim **15**, wherein the ticket is redeemable for a certain service from the selected service provider, as opposed to a cash value.

**17**. The system of claim **15**, further comprising:

(d) means for determining whether the ticket presented to the service provider has exceeded an expiration date.

**18**. The system of claim **15**, further comprising:

(d) means for the ticket-holder to purchase additional incremental value on said ticket; and

(e) means for a service provider to verify the amount of additional incremental value added to the ticket.

**19**. The system of claim **15**, wherein said processor means includes means for transmission and reception of communications over a communications network.

**20**. The system of claim **15**, wherein the ticket contains indicia of a credit card comprising at least one of a printed numerical code, an embossed **16** digit unique numerical code, and code represented by at least one of optical, magnetic and electronic encoding, which code is readable using standard point of sale equipment.

**21**. The system of claim **20**, wherein the merchant payment network is a standard credit card network.

US 7,156,294 B2

17

**22**. The system of claim **15**, wherein the ticket contains a recordable medium and wherein the recordable medium has a blank area when received by a seller, and validation information and purchase data are recorded on said recordable medium in conjunction with purchase from the seller.

**23**. The system of claim **15**, further comprising a processor coupled to the providing means, wherein the processor is programmed to report to the ticket-holder credit value information associated with the ticket, while refraining from reporting an associated monetary value thereof.

**24**. A method for provision of prepaid services, comprising the steps of:

(a) having a card issuer provide service specific tickets, each ticket having an immediately accountable value to the card issuer, each said ticket being valid for incremental quantity of services at any one of a plurality of service providers, incremental quantity being measured in terms of number of times of use of the ticket;

(b) enabling a variable rate redemption of the ticket for service provided by one of the plurality of service providers, by:

allowing a ticket-holder to select one of the service providers among the plurality of service providers for redemption in exchange for a unit use of a desired service from said selected service provider;

upon presentation of the ticket by the ticket-holder to the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being different from price debited by others of said service providers for the same said service, such that the ticket is redeemed at a variable rate among the plurality of service providers for said same service; and

effecting payment at the price debited for said service by said selected service provider; and

(c) absorbing any differences in prices debited by the plurality of service providers for the same service, and optionally adjusting price of the ticket redeemable for the service.

**25**. The method of claim **24**, wherein the ticket is redeemable for a certain service from the selected service provider, as opposed to a cash value.

**26**. The method of claim **24**, wherein the ticket is a one-time-use ticket.

**27**. The method of claim **24**, further comprising permitting optional purchase of additional incremental value above a base ticket value on the ticket; and presenting the ticket by a ticket-holder to one of a plurality of service providers in exchange for use of the provider's service where the price debited by said service provider can be higher than the base ticket value.

**28**. The method of claim **27**, wherein said additional incremental value is an upgrade of a service.

**29**. The method of claim **27**, wherein said additional incremental value is also useable to redeem services from the service provider for more than one person when the ticket is presented for use on a given occasion.

18

**30**. The method of claim **24**, further comprising the computer implemented step of:

(d) maintaining a listing indicating the plurality of service providers and respective services.

**31**. A prepaid services account management system, comprising:

(a) means for enabling a card issuer to provide service specific tickets, each ticket having an immediately accountable value to the card issuer, different tickets being redeemable for different services;

(b) inclusion listing means for identifying among plural service providers that are authorized participants, a subset of participants that are authorized service providers for at least one service, wherein for tickets redeemable for a same service, each ticket is redeemed at a variable rate among the authorized service providers for said same service; and

(c) processor means for:

(i) crediting the service provider at a variable rate for redemption of the ticket for a respective service, wherein price debited for said service by at least certain of the service providers is different from price debited by others of said service providers for the same service, such that the ticket is redeemed at a variable rate among the plurality of service providers for said same service,

wherein the service provider is selected by a ticket-holder among said subset of participants of the inclusion list; and

(ii) absorbing any differences in prices debited by the plurality of service providers for the same service,

wherein the immediately accountable value to the card issuer is at first purchase of the ticket instead of on price debited upon ticket redemption.

**32**. The system of claim **31**, wherein the ticket is redeemable for a certain service from the selected service provider, as opposed to a cash value.

**33**. The system of claim **31**, further comprising:

(d) means for the ticket-holder to purchase additional incremental quantity on said ticket, incremental quantity being measured in terms of number of times of use of the ticket; and

(e) means for a service provider to verify the amount of additional incremental quantity added to the ticket.

**34**. The system of claim **31**, wherein the service specific tickets are usable in a merchant payment network and the merchant payment network is a credit card network.

**35**. The system of claim **31** wherein first purchase is by a customer of the card issuer, and the customer reselling or gifting the ticket to the ticket holder.

**36**. The system of claim **31** further comprising reporting means for enabling reporting per ticket, any combination of (i) a difference between immediate value accounted by the card issuer and price debited by service provider, (ii) date of redemption, and (iii) location of service provider at redemption.

* * * * *

# Exhibit C

US007337949B2

(12) **United States Patent**      (10) **Patent No.:**      **US 7,337,949 B2**

Roth      (45) **Date of Patent:**      **Mar. 4, 2008**

(54) **SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS**

(75) Inventor: **Anthony G. Roth**, Newburyport, MA (US)

(73) Assignee: **Utix Group, Inc.**, Burlington, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/641,304**

(22) Filed: **Dec. 19, 2006**

(65) **Prior Publication Data**

US 2007/0095889 A1      May 3, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 11/204,803, filed on Aug. 15, 2005, now Pat. No. 7,156,294, which is a continuation of application No. 10/827,737, filed on Apr. 20, 2004, now Pat. No. 7,066,383.

(51) **Int. Cl.**
*G06K 19/06* (2006.01)

(52) **U.S. Cl.** ..................... **235/375**; 235/383; 235/379; 235/380; 235/381; 705/14; 705/39; 705/69

(58) **Field of Classification Search** ................ 235/375, 235/383, 379–381; 705/14, 39, 69
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,949,256 A | 8/1990 | Humble | |
| 5,903,633 A * | 5/1999 | Lorsch | 379/114.2 |
| 6,192,113 B1 * | 2/2001 | Lorsch | 379/114.2 |
| 6,422,462 B1 * | 7/2002 | Cohen | 235/381 |
| 6,594,640 B1 * | 7/2003 | Postrel | 705/14 |
| 2003/0050041 A1 * | 3/2003 | Wu | 455/406 |
| 2003/0053609 A1 * | 3/2003 | Risafi et al. | 379/114.2 |
| 2003/0194988 A1 * | 10/2003 | Knox | 455/406 |
| 2004/0011864 A1 * | 1/2004 | Thompson et al. | 235/380 |
| 2004/0039633 A1 * | 2/2004 | Nicholson | 705/14 |
| 2004/0068437 A1 * | 4/2004 | McGee et al. | 705/14 |
| 2004/0133511 A1 * | 7/2004 | Smith et al. | 705/39 |
| 2004/0158493 A1 * | 8/2004 | Nicholson | 705/14 |
| 2005/0033639 A1 * | 2/2005 | Myers | 705/14 |

* cited by examiner

*Primary Examiner*—Michael G. Lee
*Assistant Examiner*—Allyson N Trail
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57)      **ABSTRACT**

One-time-use tickets containing a unique identification code that allow for prepayment of entertainment or personal services are distributed and sold. When a ticket is sold, it is activated by the seller notifying a ticket information manager of its sale, at which time the ticket's unique identification code is recorded by the ticket information manager. Part of the sale price is transferred by the vendor to an account maintained by a ticketing program manager. Ticketholders present the ticket for redemption of the particular service from an agreed service provider. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated. While the purchase price of the ticket is fixed, service providers will receive their agreed payment price from the ticketing program manager's account when a ticket user redeems a ticket regardless of whether that price is higher or lower than the ticket purchase price.

**22 Claims, 2 Drawing Sheets**



FIGURE 1

Prepaid Services System  10





FIGURE 2

Prepaid Services Method

US 7,337,949 B2

**1**

# SYSTEM FOR MARKETING LEISURE ACTIVITY SERVICES THROUGH PREPAID TICKETS

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 11/204,803, filed Aug. 15, 2005, now U.S. Pat. No. 7,156,294 which is a continuation of U.S. application Ser. No. 10/827,737, filed Apr. 20, 2004 now U.S. Pat. No. 7,066,383. The entire teachings of the above applications are incorporated herein by reference.

## FIELD OF THE INVENTION

The invention relates to marketing and distributing services, especially participatory sports or entertainment services, by collecting a prepayment and issuing to a customer a ticket or similar indicia that can be redeemed for a particular service. The service is one that can be obtained at the customer's option from any of a plurality of distinct service providers, including providers that normally charge more or less than others for the particular service involved. The invention further involves accounting for the usage and payment for services on this basis.

## BACKGROUND OF THE INVENTION

Goods and services are typically obtained in exchange for payment and the payment might be rendered in various ways and in various amounts, such as by tender of cash currency, funds transfer between accounts, debit card purchase and exhaustion, credit arrangements involving future payment, barter or various other techniques. The particular goods or services that a customer might obtain from different providers differ. The reputations of providers differ. The manner of providing services, such as the time of day or as a function of demand or other aspects also differ. Importantly, the providers also demand different prices.

The differences between available offerings of goods and services generally boil down to differences in the costs and benefits of available goods and services that consumers have the option to choose. The costs and benefits of the possible choices are judged and compared by customers when making purchasing decisions. The customers seek the greatest benefit per unit cost and are free to make selections among a variety of different providers' offerings and terms, or even to substitute one type of service for another according to the customer's needs.

The relative merits and different options are perceived differently by different consumers, such that some consumers are willing to pay more or less than others for particular aspects of goods or services. The confluence of offerings (including what is offered and the terms of payment) with the selections made by consumers is the nature of the market of supply and demand by which resources are allocated among consumers in a market economy.

Not all consumer transactions are classic exercises of supply and demand wherein the customer has the utmost control and choice among differing alternatives with incrementally different costs and/or different pricing and payment arrangements. One example is a vendor's prepaid gift indicia, which can take various forms ranging from an authorized numbered slip bearing the vendor's name and a dollar amount to plastic cards bearing the vendor's logo and having a magnetically readable strip with a predetermined dollar value, each redeemable at the vendor's sales outlets. A

**2**

prepaid gift indicia is generally issued by a particular retailer and can only be redeemed at that retailer's facilities. In this situation, the person who purchases the gift indicia may exercise a degree of choice, but the person who redeems it (typically the recipient of the gift) has no choice except to use the issuing retailer as the provider. Inasmuch as the issuer and the provider are the same entity, the issuer/provider has full control of the extent to which the selling price of the gift card corresponds to the offering price of the goods or services that are delivered. It is conceivable that the issuer/provider may include a premium or discount to encourage patronage and/or purchase of gift indica, but within the control of the issuer/provider, the goods or services are provided in exchange for an amount that is related to the issuer/provider's pricing schedules.

It its known that providers of personal entertainment and sporting services, can issue a gift ticket that represents an incremental cash value or an incremental quantity of their services. This is possible because pricing and terms upon the sale of the gift ticket are controlled by the same party that controls the nature, quality and delivery terms of the services. As a result, the issuer/provider can issue a gift ticket for a given cash value or for a given increment of services. Thus a gift ticket or coupon might be granted for one pass to a matinee show or one Saturday afternoon bowling game, presumably with the ticket priced at an amount related to the pricing of the associated service. If the gift ticket is not defined as equal to a given service and/or if the issuer offers different services at different prices, then the gift ticket is denominated as a cash value and the user is entitled to deduct from the value on the ticket when paying for services, until the value associated with the ticket is exhausted.

It would be advantageous if a convenient arrangement could be organized whereby different potentially-competing suppliers of services can all honor a coupon or gift ticket or similar indicia of value that is denominated not in a monetary value but as a particular service. It is not possible for the purchaser of a gift ticket for a given increment of services from one establishment to redeem the gift ticket at another establishment for comparable services, because the services are not likely to be of the same value to consumers, or offered at the same price by suppliers. If such a system were envisioned, it would necessarily involve exchanges of cash value and not transactions for a given increment of services regardless or where it is obtained.

A gift ticket system might be envisioned where one can buy a gift ticket for an incremental entertainment service (a single movie showing, for example), but if that gift ticket was to be redeemable at any of a plurality of competing different movie theaters, some provision would be needed to account for the fact that some theaters are more comfortable, have larger screens and better sound systems and consequently have higher ticket prices than others. Such an arrangement would not likely be practical, or at least would be less practical than using cash currency, and would require a network of behind-the-scenes fund transfers in varying amounts per transaction, between establishments at which the gift tickets are sold to customers and establishments at which the customer redeems the tickets for more or less expensive entertainment services. On the other hand, one could issue gift tickets for an incremental amount of money, leaving it to the consumer to decide where to expend the gift ticket, either wholly or in some successive number of transactions that each represent less than the full initial cost of the gift ticket.

Gift tickets can resemble debit cards and be presented by customers for deduction of an incremental monetary value in

US 7,337,949 B2

**3**

exchange for goods or services of that cost. It is known to have the representation of value carried on the card itself (e.g., in the case of a "smartcard" having security aspects). Alternatively, it is known to have the card carry a serial number or address associated with a record stored in a database in communication with points of sale. These arrangements also require behind-the scenes transfer of funds among the entities selling the cards, perhaps the customer, and the entities at which the card is redeemed for goods or services.

It is known that credit cards can be issued that may be selectively limited to certain vendors, either by the users (to limit purchases by their children or others to whom the cards are lent) or by corporations (for example to employees' limit meal and entertainment expenses to certain establishments). See Cohen, U.S. Pat. No. 6,422,462 "Apparatus and Methods for Improved Credit Cards and Credit Card Transactions." Such cards are still redeemable, however, for the cash value of purchases made and the users are still responsible for paying for transactions on an as-used basis.

An arrangement that requires such a network of funds transfers is actually already in place. Credit card systems including Visa, MasterCard, Discover, American Express, etc., deal with goods/services providers across the board. They are available for the most part to any customer and to any supplier. However, existing credit card systems work because there is a medium of exchange, namely dollars and cents (or other currencies), that is the same as to all suppliers and all possible goods and services. There is no practical way in which to supply a given service, such as a round of golf or a theater ticket, that is free of association with a particular supplier and might be redeemed by the customer at any of a plurality of possible suppliers, even though their pricing may differ, without relying on a backup funds transfer network associated with the point of sale.

### SUMMARY OF THE INVENTION

An inventive system and method arrange for prepayment by a customer of a predetermined sum for indicia such as a one-time-use gift ticket. The ticket is redeemable for a particular incremental quantity of services, as opposed to a cash value. The ticket is redeemable at any of a plurality of different providers that offer services that might be more or less similar but that qualify as the stated sort of services. The system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., a movie pass (at any participating theater), a round of golf (at any participating golf course), a spa treatment (at any participating spa), etc.

The providers are independent entities that determine the nature of their own offerings and set their own prices. The gift ticket issuer enlists a number of suppliers of services to be obtained by redemption of the ticket for services, each having offerings that have character, terms and pricing arrangements that are approximately equal but may differ up to some threshold. Enlisted service providers agree to participate in the program and agree to accept the prepaid gift ticket as a payment method.

According to an inventive aspect, the enlisted service providers are not required to accept some standard or negotiated amount that is less than their regular price for services of the type that are delivered. Instead, the service providers accept for payment one time use tickets and process the sale to the customer over an existing credit card network or as some other financial transaction (including such instant payment systems as Pay Pal, which allows

**4**

secured payment directly out of an existing bank account) in which the account that is debited is the account of the entity that issued the one-time-use ticket.

Gift tickets are sold through sales outlets, through the Internet, by telephone or in large blocks to institutional purchasers. Participating merchants whose services may be redeemed through the gift ticket system can also be empowered to sell the tickets. The tickets can be retail items of purchase that are activated at the point where the tickets are sold to customers.

The customers can use the gift tickets to redeem a stated increment of services for themselves or can present the ticket as a gift. The system is particularly applicable for use in giving gifts or employee awards or incentives, because the emphasis is wholly on redemption for the services and not on redemption of a given cash value.

Gift tickets each contain a unique identification code and are loaded with a predetermined value identified as a one-time use at any customer-chosen one of the service providers who have agreed to participate and who provide the pertinent goods or services that are identified when the ticket is sold.

When a ticket is sold, it is activated by the seller, for example by scanning a bar code associated with a uniform product code or by swiping a magnetic strip on the ticket itself, and notifying a ticket information manager of its sale. At that time, the unique identification code of the ticket is noted in a memory file by the ticket information manager. A predetermined portion of the sale price (i.e. less any service fee to the vendor) can be transferred by the vendor to the ticketing program manager at the time of ticket activation. Another alternative is that the entire purchase price is credited to an account maintained by or for the ticketing program manager who then regularly compensates the vendor for its participation, either on a flat-fee basis or as some function of the number of tickets sold, including perhaps added incentives at various sales level thresholds.

Gift tickets sold over the Internet or by telephone can be mailed in an activated state or can employ security features requiring the purchaser to activate the ticket (by Internet or telephone) upon receipt, for example, by repeating a code that was given to the purchaser at the time of the sale or by repeating a password determined by the purchaser at the time of sale.

The ticket can be purchased by the ultimate user or advantageously is given by the purchaser to the end user, for example as a gift, an employee or sales incentive award, a premium item or the like. The gift ticket holder presents the ticket for redemption of the particular service from one of a plurality of agreed service providers. The identities of the agreed service providers can be stored in an inclusion table that is employed by a ticket information manager. The service provider verifies the ticket's validity by checking with the ticket information manager that the ticket's unique identification code is valid and that the ticket has been activated, in a transaction that is much the same as a credit card authorization, which can use the same point of sale network communications as a credit card transaction.

According to another aspect, although the gift ticket is issued as a onetime-use item, purchasers can choose to add incremental value to upgrade the ticket at the time of purchase or prior to redemption. This feature has two main applications. With the capability of adding an incremental value, it is possible to apply the invention to services of a given kind (such as a round of golf, for example) that have more than some predetermined threshold difference in value that prevents them from being peers. Thus, the invention can

US 7,337,949 B2

5

be applied to an arrangement in which 18 holes at an international golf course such as Pebble Beach or the Masters' course in Augusta, for example, can be regarded as distinct services from less prestigious local golf courses that represent the norm. The customer can purchase an upgrade (or several incremental upgrades if more than one is needed for a particular provider) if desired, to the higher quality level in the same category of "a round of golf," which can be redeemed at any of the venues that fall into the higher classification.

Alternatively or in addition to providing upgrades for moving upwardly between two or more classes of a given service that might render two alternatives as peers, the holder of a ticket can be permitted to obtain an upgrade that arranges a ticket issued for one person for a given class of services to be redeemable for more than one person, within the same class of services.

Upgrades as described can be purchased in a manner similar to the initial transaction at which the ticket was originally offered and sold. Alternatively, sales of upgrades can be made in various other ways, such as through an Internet web site with the use of a credit card or by touch tone telephone through an Interactive Voice Response system connected to the ticket information manager's data storage system.

It is an aspect of the system and method that the purchase price of the gift ticket is fixed, but the ticket holder can redeem the ticket at any of a plurality of providers of a given service, even though the service providers may normally assess different prices. The service providers are credited in the redemption process with their agreed payment price from the ticketing program manager, so that the provider is paid in a normal manner when a ticket user redeems a ticket for a service. In this way, ticket holders are fully as welcome at the provider's establishment as a customer that might remit cash currency when obtaining the same service. In one embodiment of the system, the ticket is recognized by an existing credit card system such as American Express, Visa, Master Charge, Discover, etc. (particularly, Discover, which currently has the capability to distinguish among vendors in an inclusion list), and can be swiped in existing point of sale terminals, thus allowing for familiar use by the service provider and instant payment to the service provider's account. The service provider is credited for the price of its services in the usual manner of a credit card network, but unlike the usual credit card transaction, a charge is not levied against the user's account, but is debited against an account held by the ticketing program manager.

A system is also disclosed to implement the marketing, sale, redemption and account management of a one-time-use gift ticket for prepaid entertainment or personal services.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing will be apparent from the following more particular description of example embodiments of the invention, as illustrated in the accompanying drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating embodiments of the present invention.

FIG. 1 is a stylized block diagram overview of a prepaid services system according to the invention; and,

FIG. 2 is a flow diagram illustrating steps of an exemplary embodiment and method of administering a prepaid services system.

6

DETAILED DESCRIPTION OF THE INVENTION

A description of example embodiments of the invention follows.

Referring to FIG. 1, a stylized overview of a prepaid services system, 10, is provided. As described herein, the prepaid services system 10 includes seven primary parties: seller 20, purchaser 30, ticket user 35, ticket information manager 70, service provider 80, financial network 90 and ticketing program manager 95.

Referring to the flow diagram of FIG. 2, at step 100, a ticketing program manager 95 desiring to implement the one-time-use gift ticket system of the invention, especially for a particular type of entertainment or personal service but also potentially for sale of goods, enlists a plurality of providers 80 of one or more substantially comparable services. The ticketing program manager 95 negotiates if necessary with the providers to honor the one-time-use ticket 40 according to the procedures described herein, namely to accept the ticket in exchange for provision of the provider's regular services and to seek remuneration for such services from the system maintained by or for the ticketing program manager.

It is advantageous for the ticketing program manager who enlists the service provider to bring the provider on as a member of a common group enterprise including, for example, advertising the enterprise and the provider's membership in the enterprise and the like. Likewise, membership in the enterprise can benefit individual providers, through additional advertising, access to new clientele and association with a product (the one-time-use ticket) that may be promoted as having a certain desirable cachet in and of itself. Additionally, it is desirable that the service providers accept the ticket at all times they are open, so that a "no-blackouts" feature of the gift ticket will enhance its acceptance in the marketplace and add to the desirability of receiving such a pass as a gift. However, it is not strictly necessary for the provider to undertake any particular responsibilities other than to provide the same services to gift ticket users as the provider provides to regular cash customers.

In this exemplary illustration of the invention, plural service providers 80 all provide at least one same stated service or article of goods, for example a round of golf, a day's worth of skiing or treatment at a health spa or the like. A broad network of providers of like services who accept the one-time-use ticket improves the marketability of the ticket, since the ability for the user to select among a variety of convenient providers is a desirable feature and one which differentiates the ticket in the present invention from ordinary gift cards or other indicia redeemable only at the retailers from whom it was purchased. It is also expected that the various providers will provide somewhat different services and may assess different charges, up to a threshold of difference within which the providers are considered to provide the "same" service as authorized and redeemable by presenting the one time use gift ticket.

Therefore, while the particular service for which a ticket is to be used is nominally the same service for that series of ticket (i.e., for tickets sold for redemption for a uniquely named or described service), the service providers need not all agree to provide identical services or to charge a dictated price for their services. Within the threshold of comparable pricing, differences in services can be accommodated owing to such factors as specific service component differences, location, prestige and quality, or other differences, as well as

US 7,337,949 B2

7

arbitrary consumer preferences. It is an inventive aspect of the subject system and method that service providers are not required to each accept identical payment value for their services, despite the fact that the gift ticket is sold for a given price and is redeemable for such services at any of the service providers.

The ticketing program manager sets the price charged by seller **20** for sale and activation of the ticket, so as to accommodate variations in actual service provider prices. One way to do this is to set the ticket price in view of the most expensive of all of the service providers, plus any service fee collected by the ticketing program manager. Another method, that advantageously allows a lower ticket price, and which can be expected to improve sales, is to set the ticket selling price near to the average charge incurred by all users of the service providers, plus costs of operating the system and a reasonable return to the ticketing program manager. Costs of operating the system can include items such as a fee to the ticket information manager for maintaining a processor to handle ticket information data storage and verification and validation of tickets and costs associated with the financial network, which might be a credit card network, in which case the credit card company might receive a portion of the sale price.

That is, the ticket selling price should be set and/or periodically adjusted so that the use of the tickets integrated over all the users and providers, has a sufficient surplus selling price over the average cost of the service (which may or may not be the same as the average provider price, given that users may frequent certain providers more than others), to provide at least a modest return on investment to the ticketing program manager. The ticket selling price is determined so that any overage that accumulates when a ticket is used to obtain the service from providers whose services are priced at less than the ticket selling price is balanced against the shortfall that arises when a ticket is used to obtain the service from providers whose services are priced higher than the ticket selling price. This calculation advantageously takes into account the extent to which users may prefer to patronize certain providers over others (e.g., providers that are perhaps more prestigious, that advertise more, that have been in business longer or that have locations that are convenient to a larger number of users). The calculation also provides for a return to the ticketing program manager over a break-even number.

After the service provider relationships have been established (step **100**) or while that is occurring, the ticketing program manager **95** establishes relationships with existing sales outlets (step **110**) who will sell the one-time-use tickets. The sellers **20** have point of sale terminals **50** connected to an existing network **60** that will allow fast, efficient communication with the ticket information manager **70**. This communication is desirable for the transfer of the information required to initialize a ticket once it has been purchased. If the existing network is connected to a financial network **90**, such as that maintained by a credit card company, this can also facilitate the automatic transfer of funds between the sellers **20** and the ticketing program manager **95** and between the ticketing program manager and service providers **80**. For example, the credit card company can maintain an escrow account for the ticketing program manager, into which funds are transferred from the sellers and from which funds are withdrawn to pay service providers. By using an existing credit card network as the financial "rail" for the system, funds transfers can be managed with minimal day to-day involvement from the ticketing program manager. While the use of an existing credit card network as

8

the communication network carries certain advantages it is also possible for the required communications to take place over an Internet connection (for example to a secure web page hosted by the account manager) or a telephone connection to either "live" operators or an Interactive Voice Response system connected to the ticket information manager's (**70**) data storage equipment.

In one exemplary embodiment, the ticket information manager **70** has a communications link or other access to a financial network **90** which is a credit card provider's network. When a ticket is swiped on a point of sale terminal **50** at either the seller's end or the service provider's end, the credit card network will communicate with or otherwise access the ticket information manager's equipment. All ticket verification or validation and approval of service providers is handled directly by the ticket information manager. The ticket information manager simply returns an accept or reject message to the credit card network, which then either causes the transaction to be processed at the point of sale terminal or not.

In an alternative embodiment, the gift ticket issuer can be a commercial organization other than a seller, with communications equipment or the like to activate the ticket through communications with the ticketing program manager.

Once relationships with the sellers **20** and service providers **80** are established, the ticketing program manager distributes one-time-use tickets (step **120**). Preferably the tickets are distributed at first in an un-initialized state, namely functional but not yet validated for use. A validation process includes placing suitable codes or notations on the tickets or storing codes in the tickets or elsewhere in a data storage medium that is accessible over a communication network. These codes can be checked when determining whether to permit use of the tickets.

In one embodiment, the tickets have a preprinted unique identification code and a magnetic strip or other means of recording information. The strip or other means can be prerecorded with a unique or at least substantially unique identification code for each ticket. The unique identification code may be an alphabetic code, a numeric code, an alpha numeric code, or other appropriate identification code capable of uniquely identifying an individual ticket, and perhaps also identifying the related type of service (e.g., golf, spa, etc.). In an alternate embodiment, the tickets do not have a preprinted or prerecorded identification code, but do contain a recordable medium such as a magnetic strip or an electronic storage device, which may be loaded with a unique code preliminarily or may have an area in which such a code is inserted as a part of the initialization procedure.

According to an advantageous aspect, the issued ticket is configured and formatted with certain indicia characteristic of a standard credit card. This can include, without limitation, printed or embossed account identification numbers, a magnetic strip or on board integrated circuit memory, a one or two dimensional optical bar code, etc. The information can be prerecorded or at least partly recordable. Two or more redundant means for storing the same information, such as an account number or the like, can be provided for data entry in different optional ways, of the different storage techniques can be used for information that is otherwise cross referenced. Advantageously, the ticket has sufficient information carried thereon to permit use of the ticket substantially in the same physical manner as a standard credit card, namely using equipment conventionally provided at a point-of-sale terminal **50** (scanners, magnetic strip swipe readers, keyboards, etc.).

US 7,337,949 B2

9

10

In one embodiment, the ticketing program manager has reserved for itself a series of digits or numbers or number combinations in a standard credit card format that are unique to the account manager and identify one or more accounts associated with the ticketing program manager. Initialization and validation steps, which are processed by a ticket information manager 70 can be undertaken over an existing communication network 60, which advantageously is a network that processes conventional credit cards, or can be another public or private data communication network. Other types of communication devices may be used instead of or in addition to a standard point-of-sale terminal programmed to handle credit cards, so long as the device is capable of communicating sufficient ticket information over an operable communications network to effect the steps as described herein. For example, in another form of the invention, the ticket information can be transmitted between the seller and the ticket information manager by telephone either by voice in association with a live operator or through a telephone keypad on an Interactive Voice Response system.

The one-time-use ticket proceeds through several steps associated with initial issue, sale (preferably with validation concurrently upon sale), and later presentation as an identification of value used to present remittance for a service. At step 130, the purchaser 30 selects a gift ticket for purchase and pays the seller 20 some agreed purchase price 31. This transaction can be a conventional retail, wholesale or other transaction in which one or more tickets are exchanged for cash or credit or other remuneration.

At step 131, the seller 20 activates the ticket, preferably including transmitting an identification code that is or becomes associated with the ticket (e.g., is at least partly read from or written onto the ticket). The identification code is at least substantially unique to the ticket and is transmitted over the existing communications network 60 to the ticket information manager 70 or to a data store associated with the ticket information manager 70. If the system is such that the ticket already has a preprinted or recorded identification number, the ticket information manager compares this number with the numbers of tickets that it has previously distributed to sellers as one step in determining validity. If the ticket has a valid number that has not already been processed, the ticket information manager records the ticket's number, noting for example in a data memory that the ticket has now been purchased and should be authorized for use. Other information is also preferably recorded, including at least the purchase price and the date of the sale transaction (step 132). The ticket information manager preferably acknowledges by communication back to the seller that the ticket is valid and now has been initialized (step 133), although the acknowledgement can be deferred or accomplished off line.

The seller 20 then accepts payment 31 from the purchaser 30 (who might or might not be the ultimate ticket user). At some point, the seller 20 transfers payment 21 to the ticketing program manager 95, preferably through a financial network 90 such as a credit card network. If a credit card network is used, funds can be automatically transferred to an escrow account maintained with the credit card company for the ticketing program manager 95. Although the seller could have previously paid the ticketing program manager 95 in full for the tickets and then resells them to customers, it is preferable that payment to the ticketing program manager's escrow account is made from funds received from the customer 30. Therefore, payment 31, 21 is transferred to or for the benefit of the ticketing program manager when payment is tendered by the customer 30. The payment 21 to the ticketing program manager (or it's escrow account) is the payment tendered, less a portion of the sale price that is due to the seller (step 134) in consideration of making the sale.

In an embodiment wherein the communication network 60 is an existing credit card network, credit can be transferred immediately to the ticketing program manager's account. In another embodiment, the initialization process can take place over the Internet, e.g., via a secure web page hosted by the ticketing program manager or another party providing account transfer services. For example, payment to the ticketing program manager's escrow account can be effected through available Internet payment mechanisms such as Pay Pal, which provides for value transfer to user's accounts. Otherwise, the seller 20 can remit funds owed to the ticketing program manager 95 on an invoiced or other basis. Because the initialization of the ticket (steps 131-133) must be done through the ticket information manager 70, an exact, up-to-date record is maintained of how many tickets each seller has sold, and at what price. This facilitates accountability and correct payment to the ticketing program manager or into its escrow account.

Once a customer has purchased a ticket, the ticket may be used by the purchaser 30 or by someone to whom the purchaser has conveyed the ticket, for example as a premium or as a gift for redemption, etc. The ticket is used as a representation of value used as remittance at any of the agreed service providers 80. (Inasmuch as the user 35 might or might not be the same party as the purchaser 30, for the purpose of this description, the term "user" should be construed to encompass an initial purchaser or anyone to whom the purchaser has conveyed the ticket.)

A ticket user 35 presents the ticket to a service provider at step 150 in order to redeem the indicated service. At step 151, the service provider preferably verifies the validity of the ticket by data transfer with the ticket information manager 70 over the communications network 60. If the communications network is one that is maintained by a credit card provider, the credit card provider's equipment would recognize the unique identification code as being not an ordinary credit card but a onetime-use ticket and would contact the ticket information manager to perform verification of both the service provider's inclusion in the program and the validity of the individual ticket. As a first check, the ticket information manager will verify that the service provider is among those who have agreed to accept the tickets. (Step 152). This may be accomplished by the storage of an inclusion table by the ticket information manager. If the communications network is also a credit card network, the initial screening for whether a service provider is listed in an inclusion table can also be made by the credit card service provider. The unique identification code associated with the ticket is then transmitted to the ticket information manager. At step 153, the ticket code is compared with a list of codes stored in a data base maintained by (or for) the ticket information manager, namely a list of valid ticket codes for initialized but as-yet-unused tickets. If the ticket code is valid and the ticket has not yet been used, the ticket information manager returns a message to the service provider (via the credit card network if employed as part of the system) that the ticket is valid, indicating that the user may redeem a single use of the service provider's services, such as the aforementioned round of golf, day of skiing or treatment at a health spa or the like. The ticket information manager then records data referenced to the ticket code to represent that the ticket has been used, so that the ticket may not be used validly again (step 154).

US 7,337,949 B2

11

By communicating to the service provider **80** that the ticket is valid, the ticket information manager **70** basically indicates that the ticketing program manager **95** will remit payment **81** to the service provider **80** the purchase price of the service for which the ticket user **35** has presented the ticket. If a credit card provider is serving as the financial network and the communications network, the ticket information manager can signal the credit card provider to release funds from an escrow account maintained for the ticketing program manager directly to the service provider's account. To facilitate validation, it is possible for a service provider that offers various services to report to the ticket information manager that a particular service is being redeemed, whereby the ticketing program manager can account for the amount to be remitted. Finally, the ticket information manager sends a notification to the financial network that a ticket has been redeemed, at which point the financial network provider transfers payment **81** from the ticketing program manager's account to the service provider's account. (Step **155**).

In the embodiment wherein the communications network **60** is (or links with) an existing credit card network, credit for the funds may be transferred from the ticketing program manager (or its escrow account maintained by the credit card network) to the service provider's account immediately in the same way as a credit card transaction, but customer is not privy to the accounting details of price and the like, and preferably is not required to present identification or sign receipts or the like, because the monetary transaction is between the ticketing program manager and the service provider.

Although a credit card network can be used, the communications network can be another public or private data communications network, such as an Internet connection to a web page hosted by (or for) the ticket information manager or alternatively by the ticketing program manager. The ticketing program manager can transfer funds to the service provider using a variety of Internet-based services, such as Pay Pal, Bill Point, etc. Otherwise, the ticketing program manager can make payment by check or other means to service providers on a periodic basis to account for the number of users that have used that service provider's services since last payment. It will be recognized that the separate functional blocks depicted in FIG. **1** as ticket information manager **70** and ticketing program manager **95** may be performed by the same entity. It should be recognized that an escrow account can be maintained either by the ticketing program manager as depicted in FIG. **1** or by the financial network **90** on behalf of the ticketing program manager.

If, at step **153**, the ticket information manager determines that the ticket does not have a valid identification code, or has a code for a ticket that has already been used once, then a message is returned to the service provider indicating that the ticket is not valid and that the service provider should not accept the ticket as payment for services. A similar message would result if, at step **152**, the ticket information manager does not recognize the service provider as one who has agreed to participate in the prepaid leisure activity services system. That is, the service provider is not listed in the ticket information manager's inclusion table.

It is an aspect of the invention that the gift ticket carries information and functions as a means for the user to obtain and remit for an incremental service, as opposed to an incremental sum of money. The various service providers may actually charge different amounts for services. A given service provider may assess different charges at different

12

times. Likewise the retailer that originally sold the ticket to the customer may have more or less of a markup. From the user's standpoint, the system treats the ticket as the means to provide an increment of services (or possibly goods) apart from these pricing considerations, which is advantageous. At step **160**, after the system has been in operation for some period of time, the ticketing program manager can compare and reconcile any overage/underage on proceeds received on tickets presented for higher or lower priced service providers and/or sold by sellers with higher or lower markups, and adjust pricing and payment strategies or provider membership arrangements, if necessary. These differences are absorbed and averaged by the ticketing program manager, who can make certain decisions about how the system is run and priced. For example, the ticketing program manager may decide based on experience to adjust the sale price of future tickets or may determine that certain sellers and/or providers will or will not become or remain active, competition and supply and demand causing the market to reach an equilibrium. However, because the gift ticket represents credit for a service and not a monetary value to the users, a change in price for new ticket purchases will not affect the redeem-ability of tickets already purchased.

In another embodiment of the invention, the purchasers or ticket users are provided a capability to add a limited amount of incremental value to the ticket (an upgrade), either at time of purchase or at any time after purchase and prior to redemption of the ticket for services (step **140**). The addition of incremental value can be employed at least two ways. The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another method, additional incremental value is used to allow the user to redeem the ticket to accommodate providing the service to additional people at the time of redemption, for example, so that the user and a guest or guests can pay for all of their rounds of golf on the ticket. According to a preferred arrangement, a ticket with additional incremental value, like an initial ticket, cannot be presented on more than one occasion. Instead, the ticket is marketed and used as a one-time-use ticket for a given service, and adding increments refers to adding (or perhaps changing) the service that is provided when the single use is redeemed by one or more associated users. It will be recognized that the incremental upgrades for higher-priced service providers and for allowing additional guests can also be combined to allow either or both options as part of the method.

US 7,337,949 B2

13

14

The feature incorporating the addition of incremental value can apply to allow use of the ticket at service providers whose services are priced significantly higher than the initial value of the ticket, e.g., services that are substantially different and that might be expected to be priced very differently from other services of the same category. If a user wants to redeem the ticket at one of these service providers, incremental value must first be added to the ticket. Incremental value need not necessarily be an integer multiple of the ticket's initial value, but can be a fraction of the initial value. However, it is a particular feature of the invention that the ticket always reflects incremental values, or credits, to the user, and not monetary value. While the ticket information manager may store for each ticket data representing the actual monetary value that has been purchased by the ticket user, any features that allow the user to retrieve information about the ticket (such as Interactive Voice Response or Internet access described more fully below) will always return incremental credit information and not monetary value to the user. This distinction reinforces the premise that the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service.

In another embodiment of the invention, a user can purchase additional incremental value directly from the ticketing program manager, or an agent of the ticketing program manager. This can be implemented in various ways, including via telephone or the Internet.

A telephone-based method for allowing purchase of additional incremental value can be implemented either with "live" operators who respond to users' telephone calls or with Interactive Voice Response (IVR) equipment. In a live operator system, the operators will have access to the ticket information manager's database of ticket (and, if applicable, user) information and can search, access and modify the information via a computer terminal or like device. Another option provides for the ticket information manager (or, alternatively the ticketing program manager) to maintain an (IVR) system that is entirely computerized. Users who call to add additional value to their tickets will do so by entering numbers on the telephone keypad, in response to computer generated messages, such as "Please enter 1 to add value to your ticket. Now enter your 16 digit ticket number followed by the pound sign." Ticket information can be read back to the user with voice simulation or prerecorded messages stored as a part of the IVR system. It is also possible to combine live and IVR systems so that users have the option of performing the transaction with a person or a computer.

A further embodiment of the system provides for Internet-based account management. The ticket information manager (or, alternatively the ticketing program manager) can maintain computers connected to the Internet and programmed to allow users to access and update ticket information or upgrade ticket value via a web page. The web address can be preprinted on the tickets or on the packaging with which the tickets are sold. Upon entering the ticket information manager's secure web site, users will be asked to enter the unique identification code of their ticket. The ticket information manager's computer will check the ticket number against the database of valid ticket numbers and if the number is valid, allow the user to add value to the ticket, and pay for the transaction through a standard credit card. The ticket information manager's database will then be updated to reflect the additional value added to the user's ticket and credit will be added to the ticketing program manager's account. In an Internet based option, the user can also use the Internet to simply verify ticket value or expiration date and once connected to the ticket information manager's web page also search for service providers in the user's locality, or in a travel destination where the user expects to redeem the ticket. This feature gives added value to service providers since the web access gives the service providers an opportunity to provide web page links with customized advertising or other information in addition to standard information provided by the ticketing program manager's web site.

In any embodiment of the invention that allows user retrieval of ticket information, the actual cash value that has been purchased in connection with the ticket is never available to the user, only the number of incremental credits loaded onto the ticket.

Those skilled in the art will recognize that the ticket information manager's database can be set up to store information beyond the ticket number and value associated with a ticket. For example, user identification information such as name, address and e-mail address can be stored at the time a user purchases a ticket. Storage of this information would, for example, allow the ticketing program manager to replace a lost ticket upon presentation by the user of such personal identification information. The ticket information manager can search its database for a user's name and determine whether the user's ticket has been redeemed. If the ticket has not yet been redeemed, then the lost ticket number can be canceled and a new ticket issued to the user. This transaction could be implemented either in person through a seller or with the ticketing program manager (or, alternatively, the ticket information manager) via telephone or the Internet as described above. Recordation of user information can also provide a valuable feature to service providers who, if given access to such information (either for a fee or by other agreement with the ticketing program manager) can access that information for marketing purposes, and can target marketing specifically to users who have redeemed their tickets at that particular service provider.

In the case where a ticket can have additional incremental value added, part of step **153** would include not only verifying that the ticket is valid, but determining the total value of the ticket. Again, the ticket's value as seen by a user is not intended to be in monetary units, but incremental credits. For example, a ticket may be initialized with one credit at time of sale (a base value), and be valid for a single use at all service providers who accept the base value. Additional credits can be fractions of the base value. For example, additional increments might be one quarter of the initial value. A user can then purchase four additional increments to take a guest if that is a feature of the system, or might purchase only the number of incremental credits to be able to use the ticket at a service provider who does not accept the base value of the ticket. In this embodiment of the invention, the service provider will verify the ticket's validity and its value at time of redemption. Because the ticket is a one-time-use ticket, any additional value on the ticket that exceeds that needed for the user to redeem the service will be lost to the user.

While this invention has been particularly shown and described with references to example embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention encompassed by the appended claims.

What is claimed is:

1. A method for providing a payment mode for services, comprising the steps of:

US 7,337,949 B2

15

(a) providing service specific payment modes, each payment mode possessing a substantially unique identifier and representing an initial value to be remitted for use of a desired service, each said payment mode configured to be valid for incremental quantity of services at any one of a plurality of service providers; and

(b) enabling a variable rate redemption of the payment mode for service provided by one of the plurality of service providers, by:

allowing a user to select one of the service providers among the plurality of service providers for redemption in exchange for a unit use of a desired service from said selected service provider;

at the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being able to be different from price debited by others of said service providers for similar service, such that the payment mode is redeemable at a variable rate among the plurality of service providers for similar service; and

effecting payment at the price debited for said service by said selected service provider.

**2**. The method of claim **1**, wherein the payment mode is redeemable for a certain service from the selected service provider, as opposed to a cash sum.

**3**. The method of claim **1**, further comprising the steps of absorbing any differences in prices debited by the plurality of service providers for similar service, and optionally adjusting price of the payment mode redeemable for the service.

**4**. The method of claim **1**, wherein the payment mode is configured for data transfer over a communications network capable of recognizing the unique identifier, the communications network including any of a credit card network, a debit network, and a financial transaction network.

**5**. The method of claim **1**, wherein the payment mode is a one-time use payment mode; and

further comprising permitting optional purchase of additional incremental value above a base value on the payment mode; and presenting the payment mode by the user to one of a plurality of service providers in exchange for use of the provider's service where the price debited by said service provider can be higher than the base value.

**6**. The method of claim **5**, wherein said additional incremental value is an upgrade of a service.

**7**. The method of claim **5**, wherein said additional incremental value is also useable to redeem services from the service provider for more than one person when the payment mode is presented for use on a given occasion.

**8**. The method of claim **5**, wherein said one-time-use payment mode has a maximum value that may be added to the payment mode and further comprising the additional step of verifying that any additional value to be added does not exceed the maximum value.

**9**. The method of claim **1**, wherein the payment mode is valid for redemption for a limited period of time and further comprising the additional step of the service provider's verifying an expiration date of the payment mode.

**10**. The method of claim **1**, wherein customer information is recorded at the time of purchase and further comprising at least one of said customer and user obtaining a replacement payment mode upon presentation of customer identification after the original said payment mode is lost or stolen and has not already been accepted by a service provider.

16

**11**. The method of claim **1**, further comprising communicating between the user and a processor over a public communications network for checking a payment mode status, said processor having access to stored payment mode data, wherein said communicating excludes reporting of any monetary value associated with the payment mode but includes reporting incremental credit information.

**12**. The method of claim **1**, further comprising the computer implemented step of:

maintaining a listing indicating the plurality of service providers and respective services.

**13**. A prepaid services account management system, comprising:

(a) means for providing and validating service specific payment modes usable in a merchant payment network, each payment mode having a respective unique identifier and an initial value remittable for use of a desired service, different payment modes being redeemable for different services and payment mode validation being based on at least respective unique identifiers;

(b) inclusion listing means for identifying among all service providers that are authorized participants in the merchant payment network, a subset of participants that are authorized service providers for at least one service, wherein for a payment modes redeemable for a similar service, each payment mode is redeemable at a variable rate among the authorized service providers for said similar service; and

(c) processor means for:

(i) communicating to the validating means the unique identifier of a payment mode received from a service provider, the processor means signaling refusal if the validating means indicates that the payment mode is not properly redeemable as presented; and

(ii) crediting the service provider at a variable rate for redemption of the payment mode for a respective service, wherein price debited for said service by at least certain of the service providers is different from price debited by others of said service providers for similar service, such that the payment mode is redeemed at a variable rate among the plurality of service providers for similar service,

wherein the service provider is selected by a user among said subset of participants of the inclusion listing means.

**14**. The system of claim **13**, wherein the payment mode is redeemable for a certain service from the selected service provider, as opposed to a cash sum.

**15**. The system of claim **13**, further comprising:

(d) means for determining whether the payment mode presented to the service provider has exceeded an expiration date.

**16**. The system of claim **13**, further comprising:

(d) means for the user to purchase additional incremental value on said payment mode; and

(e) means for a service provider to verify the amount of additional incremental value added to the payment mode.

**17**. The system of claim **13**, wherein said communications in (c) include transmission and reception of communications over a communications network; and

the merchant payment network includes any of a credit card network, a debit network, and a financial transaction network.

**18**. The system of claim **13**, wherein the payment mode contains indicia of a credit card comprising at least one of a printed numerical code, an embossed 16 digit unique

US 7,337,949 B2

17

numerical code, and code represented by at least one of optical, magnetic and electronic encoding, which code is readable using standard point of sale equipment.

**19**. The system of claim **18**, wherein the merchant payment network is a standard credit card network.

**20**. The system of claim **13**, wherein the payment mode contains a recordable medium and wherein the recordable medium has a blank area when received by a seller, and validation information and purchase data are recorded on said recordable medium in conjunction with purchase from the seller.

18

**21**. The system of claim **13**, further comprising a processor coupled to the providing and validating means, wherein the processor is programmed to report to the user credit value information associated with the payment mode, while refraining from reporting an associated monetary value thereof.

**22**. The system of claim **13** wherein at least one service by a subset of authorized service providers has a predefined limit per given day.

\* \* \* \* \*